**Amy Beth SUGARMAN, and Carla Lynn Sugarman, infants, by their Guardian ad Litem Shirley Sugarman, now known as Shirley Ellin and Shirley Sugarman, now known as Shirley Ellin, Plaintiffs,**

v.

**NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 18817.**

United States District Court
E. D. New York.

Jan. 9, 1962.

Leon Wasserman, New York City, for plaintiffs.

Casey, Lane & Mittendorf, New York City, for defendant.

DOOLING, District Judge.

The widow and children of Herbert Sugarman, claiming that he died by an accident that fatally activated a pre-existing but dormant and undetected physical weakness, sue the defendant insurance company on its promise to pay them, as the beneficiaries of a life insurance policy on Sugarman's life, an additional benefit of $6,000 upon receipt of due proof

> "that the death of the Insured was due to bodily injury effected solely through external, violent and accidental means, which injury (except in the case * * * of internal injury revealed by an autopsy) is evidenced by a visible contusion or wound on the exterior of the body and * * * that death occurred within ninety days after * * * such injury and as a direct result thereof, independently of any other cause, * * * that death did not

in any way result from any of the Risks Not Assumed * * * ".

It was agreed between Sugarman and defendant in the insurance agreement that defendant

"does not assume the risk and shall in no event incur any liability under this Agreement, if death, even by accidental means, shall result directly or indirectly, wholly or partly, from * * * any disease or infirmity, or any medical or surgical treatment for such disease or infirmity * * * ".

The insured died on June 29, 1957 at a hospital in Lake Placid, New York. Plaintiffs contend that the insured either struck his head on the transom of a staircase or fell from the staircase while descending the stairs and ruptured a perhaps congenital and certainly undetected saccular aneurysm of the right middle cerebral artery, resulting in hemorrhage in the right temporal lobe of the brain, causing death; the rupture, it is argued, resulted from the head injury or from a surge of blood occasioned by the fall. Defendant contends that the evidence shows no accident and that even if an accident ruptured the aneurysm, the insured's injury was not effected solely through accidental means and did not result directly from the injury independently of any other cause but resulted directly or indirectly, wholly or partly, from a disease or infirmity, that is, the preexisting aneurysm.

On the day before he died the insured rose early and drove his wife and two children some three hundred miles from Valley Stream to an island cottage in Lake Placid, arriving at about four o'clock in the afternoon. He went swimming and returned to the cottage complaining of a headache. He ate supper, spent a quiet evening and went to bed and to sleep at about ten o'clock. At about two o'clock in the morning the insured got out of bed to go downstairs; a few seconds later his wife heard a noise and ran downstairs to find her husband prone on the floor and at the verge of a swiftly ensuing unconsciousness from which he never recovered. She dragged him to a couch under the staircase and three hours later the unconscious man was removed from the island to Lake Placid Hospital. The insured was admitted to the hospital just before six o'clock and died at seven o'clock of the same morning. The post-mortem anatomical diagnosis of the cause of death, made over seven months later and adopted by plaintiffs, was "Hemorrhage into right temporal lobe of the brain from ruptured saccular aneurysm of the right middle cerebral artery".

How long the insured's aneurysm antedated his death is unknown; it was developmental and its final state a function of time measured in years. Such an aneurysm as the insured's can be symptomatized by headache, double vision, nausea, fainting, and unsteadiness of gait; but an aneurysm can also go wholly undetected for a very long time and then produce sudden death by entirely spontaneous rupture. An aneurysm may be ruptured by a blow to the head or by an activity of the body that increases intracranial pressure. Discovery of such an aneurysm as the insured's (and such discovery would be unlikely in the extreme in the absence of manifest symptoms) would result in immediate medical treatment, either a straitened regimen of activity calculated to prevent occasions of increased intracranial pressure, or immediate brain surgery. The aneurysm in its final state was a grossly abnormal condition in the affected artery.

The insured experienced headaches in his lifetime but their intensity and frequency were not readable as symptoms of an aneurysm. His last headache was not referred to the aneurysm but to his sinuses. The aneurysm was in fact completely undiagnosed before the insured's last hospitalization and there is no evidence that medical error rather than the inscrutability of the condition prevented its detection.

The aneurysm was not dormant or inactive nor was it a static condition. It was, on the evidence, a developmental abnormality and capable, unaided of any

external stimulus, of producing death though not, even in extended time, certain to do so. The aneurysm had not produced recognizable sensible effects, but it was an unrelenting threat to life.

■ The direct medical evidence excludes inference of a head injury from the ante-mortem and post-mortem findings of the examining physicians and outweighs the uncertain evidence of a "red impression" perceived on the right side of the insured's head after he was found on the floor. There is no direct evidence of accident to the insured. No one saw the insured in the interval between his leaving the upstairs bedroom and his being found on the floor downstairs. While his wife testified to hearing a noise described as "terrible", which might be taken as more descriptive of a damaging fall than of a collapse from illness, two disinterested witnesses testified that at the time of the incident the insured's wife said that her husband had collapsed not fallen.[1] The disparity between the wife's contention at the trial and her statements in 1957 reflects different inferences drawn from the limited data she had at both times, but the more trustworthy inference is the one she drew at the time when she spoke from still vivid impression rather than later when she had to reconstruct the event from memory. If, as she testified, the insured when she asked him what had happened, said "I fell" and then became incoherent and finally unconscious, she did not in 1957 credit the statement when weighed against what little she could then have observed and heard.

■■ The challenge to the admissibility of the statement "I fell" has very strong support and the statement itself is of limited evidentiary value. For what they are worth, the question and response were integral to an event still in the process of occurrence; such an ex-clamatory question as the wife asked is extorted by the event and the cryptic response is episodic not narrative. Insurance Co. v. Mosley, 1869, 8 Wall. 397, 75 U.S. 397, 404–409, 19 L.Ed. 437; Walker v. Prudential Ins. Co., 5th Cir., 1942, 127 F.2d 938, 940; Chesapeake & Ohio Ry. v. Mears, 4th Cir., 1933, 64 F.2d 291–293; People v. Del Vermo, 1908, 192 N.Y. 470, 483–487, 85 N.E. 690, 695–696; compare Greener v. General Electric Co., 1913, 209 N.Y. 135, 137–138, 102 N.E. 527, 528, 46 L.R.A.,N.S., 975 (distinguishing the Del Vermo case without expressed disapproval). See United States v. Mountain State Fabricating Co., 4th Cir., 1960, 282 F.2d 263, 265–267; Swensson v. New York, Albany Dispatch Co., 1956, 309 N.Y. 497, 502–504, 131 N.E.2d 902, 904–905; compare Guild v. Pringle, 4th Cir., 1904, 130 F. 419, 421–423 (differentiating the Mosley case). But consideration of this doubtful evidence, coupled with recognition that it is extraordinary that natural death should have occurred in a situation that invited accident, is not enough to persuade that an accident occurred. It is as probable as not that the rupture occurred before the insured left his bed. It is therefore, concluded, on the facts, that there was not a blow or fall preceding rupture of the aneurysm.

Even had there been an accident, however, it is concluded that the law of New York, applied to the contract of insurance and the facts, precludes a recovery. The language used in the contract of insurance to define the coverage is strenuously articulate and, presumptively, it has not been found unfair or deceptive (New York Insurance Law, §§ 141, 154, subd. 1, McKinney's Consol.Laws, c. 28, empowering the Superintendent of Insurance to disapprove contracts containing provisions that encourage misrepresentation or are unjust, unfair, inequitable, misleading, deceptive or contrary to law

1. The hospital record, corroborating the testimony of one witness, was admissible to show that the wife did not report a "fall" to the attending physician. See Williams v. Alexander, 1955, 309 N.Y. 283, 287–288, 129 N.E.2d 417, 419–420;

Lorensen v. Sinclair Refining Co., 2d Cir. 1959, 271 F.2d 528; Woods v. Mahbern Realty Corp., 1st Dept. 1958, 5 A.D.2d 411, 413, 172 N.Y.S.2d 503, 505, bears on a second aspect of admissibility.

or policy). The contract covers death that results from injury effected solely through accidental means and excludes from coverage deaths, even by accidental means, that result "wholly or partly", "directly or indirectly", from "any disease or infirmity". Nevertheless the law of New York is incontrovertibly settled that where two equally indispensable causes concur to produce death and one of the indispensable causes is an accident that would not produce death in the average instance and the other indispensable cause is an abnormal condition in the insured's body, such language as the insured and insurer here agreed upon does not absolutely preclude recovery of the indemnity payable upon accidental death; the bodily abnormality that concurs to cause death must respond to a particular qualitative analysis to preclude recovery. Compare Silverstein v. Metropolitan Life Ins. Co., 1930, 254 N.Y. 81, 171 N.E. 914 (allowing recovery) with McMartin v. Fidelity & Casualty Co., 1934, 264 N.Y. 220, 190 N.E. 414 (the limiting case). The Silverstein case impliedly defines the abnormality that will not preclude recovery; if the bodily condition is not of itself capable of doing significant mischief and would not, therefore, commonly be called, if known, a diseased condition, it does not preclude recovery even though without it the accidental cause could not produce death. The abnormality in the Silverstein case proved conditionally capable of producing the maximum mischief that bodily abnormality can produce. The McMartin case held that the abnormality present precluded recovery, not simply because it was an indispensably concurrent cause of death but because it was, in common speech, a disease; it was progressive and capable in its probable and natural development of being a source of mischief; it could not

be reduced on analysis to characterization as a predisposing tendency. Eisser v. Commercial Travelers Mutual Accident Assn., 1936, 272 N.Y. 581, 4 N.E.2d 813, aff'g. 2d Dept., 247 App.Div. 727, 285 N.Y.Supp. 266, makes it clear that there may be a question of fact whether an abnormality amounts to an active disease which precludes recovery if it interacts with an accidentally produced illness to cause death. But it must be doubted that it can be extrapolated to mean that what is commonly called a disease and in fact contributes to death can be eliminated from consideration on the ground that it is dormant, latent or inactive and has been activated by an accident (Novick v. Commercial Travelers Mut. Acc. Ass'n, City Court, Bronx Co., 1953, 203 Misc. 830, 118 N.Y.S.2d 533, 536) for the case relied on for that proposition (McGrail v. Equitable Life Assurance Society, 1944, 292 N.Y. 419, 426–427, 55 N.E.2d 483, 487) does not go nearly so far and rather holds that a jury may find as a fact that such a condition as an undetected arteriosclerosis is, circumstantially, not a disease at all but a condition expectably occurring with advancing age.

None of the cases authorizes a conclusion that death from the rupture of such an aneurysm as the insured unknowingly harbored can be found as a fact to be death due to injury effected solely through accidental means and not resulting wholly or partly, directly or indirectly from any disease or infirmity. As a matter of law the morbidity of the artery bearing the aneurysm the rupture of which caused death was a grave infirmity or disease; its role in producing death precludes recovery even if an accidental blow or fall produced the increase in intracranial pressure that effected the fatal rupture of the aneurysm.[2]

2. The Court in Sugarman v. The Equitable Life Assurance Society (Sup.Ct., Queens Co., Trial Term Part IX, Jan. 18, 1961) submitted the issue on the same facts to the jury. Neither that action nor the language and import of the Court's charge is a clear authority for either party. The jury verdict for defendant was not, apparently, made the subject of any motion on which the Court would have had occasion to express its views on the law.