MATTHEW J. SCHOLLE, Adm'r of the Estate of Rita M. Scholle, Plaintiff-Appellee, v. CONTINENTAL NATIONAL AMERICAN GROUP, Defendant-Appellant.

Second District (1st Division)   No. 75-513

Opinion filed November 22, 1976.—Supplemental opinion filed upon denial of rehearing January 20, 1977.

John Berwanger, David C. McLauchlin, and Richard E. Mueller, all of Lord, Bissell & Brook, of Chicago, for appellant.

Richard J. Smith, of Sullivan, Smith & Hauser, of Waukegan, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The plaintiff recovered a judgment for damages in the amount of $30,000 for the accidental death of Rita M. Scholle who was insured against accidental death by the defendant. Defendant's motions for judgment notwithstanding the verdict or in the alternative for a new trial were denied and defendant appeals. It contends that the evidence most favorable to the plaintiff did not prove that death was caused by an accident. In addition, defendant claims that the court committed reversible error in restricting cross-examination of plaintiff's medical expert. There is no argument as to the construction of the terms of the policy.

The record includes testimony that the decedent was a 32-year-old woman who, on October 30, 1971, fell from a platform surrounding her swimming pool. She had been standing on the platform using an eight-foot skimming net to remove floating leaves from the pool. She fell a distance of 2½ feet, striking some decorative stones which surrounded the pool.

Her husband, Matthew Scholle, testified he saw her on the ground and helped her up. She told him she had been reaching with the net for some leaves and lost her balance, started to fall into the water, overcompensated and fell backward off the deck. She stated at the time that she was "O.K." but noted a little soreness in her head and neck area. Mr. Scholle also noted a slight redness in that area but there were no bruises or breaks in the skin. They completed storage of various items connected with the pool but canceled their plans for the evening because Mrs. Scholle complained of a headache and of not feeling well. The next morning they dressed and went to church for an early morning mass. Upon returning home Mrs. Scholle prepared breakfast for herself, her husband and some workmen who were in the process of winterizing the swimming pool. She was not able to finish breakfast herself and went to bed complaining of a headache and a stiff neck.

Mrs. Scholle got up later that afternoon and both she and her husband decided to go to a restaurant to eat. Shortly after getting dressed she complained of the worst headache she had ever had and collapsed. Her husband helped her into the bedroom and later that night she was taken to the hospital by a rescue squad. There was testimony that prior to her fall Mrs. Scholle had been physically active and in apparent good health.

Dr. Alan Minster who specialized in neurosurgery testified for plaintiff. On direct examination he stated he first examined Mrs. Scholle in the hospital on November 3, 1971. He took a medical history primarily from Rita Scholle's husband but as to which Mrs. Scholle nodded her agreement. She stated that when she fell and struck her head she was not "knocked out" but she had a headache afterwards and the rest of the evening and the following morning she had a headache and felt strange. Some time the following day she had a sudden terrible headache, the worst headache she had ever had in her life. Her next recollection was when she was in the hospital.

Dr. Minster conducted a neurological examination and found that Rita Scholle was awake and alert and complained of headache and a mild stiff neck. He found an abnormal neurological reflex called a bilateral Babinski response which indicated that something was wrong inside her head or spinal cord but "is kind of a generalized problem." He saw the reports of Dr. Rowley who had examined Mrs. Scholle when she first came to the hospital. Dr. Rowley performed a spinal tap, found the fluid to be bloody and recommended that she be seen by a neurosurgeon.

Dr. Minster's initial impression was that Rita was bleeding inside the head and that further tests would be required to find the cause of the bleeding. An angiogram test was made which showed that the patient had an aneurysm. The aneurysm was described as about one-half inch in size, a kind of ball or sac that bulges off a blood vessel inside the head. Dr. Minster characterized it as a berry aneurysm. He said there were no known tests to show how long the aneurysm had existed. He had planned an operation when very suddenly she became comatose and died on November 12, 1971, 12 days following her fall.

The doctor was asked the following questions and gave the following answers on direct examination:

"Q. Doctor, do you have an opinion to a reasonable degree of medical certainty based upon your experience and education and your treatment of patients and your treatment of Rita Scholle as to whether or not the fall which you referred to and described in the medical history taken from the patient could or might have contributed in whole or in part to the rupture of the berry aneurysm?

A. Yes, I have.

Q. What is that opinion, Doctor?

A. I think it could have.

Q. Doctor, are there any existing medical techniques, tests, procedures by which the trauma experienced in that fall which you described in relating the medical history, can be ruled out as a cause of the rupture of the berry aneurysm?

A. No, sir.

Q. When aneurysms rupture, Doctor, again based upon your experience and your background, are they occasionally preceded by a leaking of the aneurysm and then the rupture, or maybe I'm not being clear, maybe—

A. You're being clear, but it's a question that cannot be answered yes or no because aneurysms are not found out usually until they rupture and what happens before they rupture no one really knows.

Q. Do you have an opinion, based upon a reasonable degree of medical certainty—and keep in mind I'm asking you about opinions, not tests—as to the symptoms that are caused or may be caused by a leaking aneurysm, slowly leaking aneurysm prior to rupture?

A. Yes.

Q. What is that opinion?

A. Well, if there is such a thing as a leaking aneurysm which is arguable in the medical community, it is thought that the symptoms would be headaches, stiff neck, a vague complaint of

something being wrong and possibly a slight troubles [*sic*] with thinking."

On cross-examination the doctor gave an opinion based on a reasonable degree of medical certainty that Mrs. Scholle's aneurysm "probably was" congenital; that the aneurysm could suddenly rupture without any warning and that upon rupture it would be possible for one to pass out and momentarily lose balance as an early sign of the rupture. He also stated that an aneurysm could break on its own without known or obvious cause and that such a "spontaneous" rupture was a common occurrence. He could not give an opinion based upon a reasonable degree of medical certainty whether Mrs. Scholle's aneurysm came from the trauma or whether it ruptured spontaneously. Defense counsel sought to elicit an answer that therefore the doctor was "speculating" but an objection to the question was sustained.

Also on cross-exmination, defense counsel attempted to suggest that the doctor had no basis for believing that the rupture occurred after the fall. He was asked if it were possible that the rupture originally could have occurred as a leak causing a momentary imbalance resulting in the fall. Dr. Minster responded that it was possible, but that he assumed otherwise because the symptoms followed the fall and because it would be unusual for loss of balance to precede the symptoms of a headache and stiff neck. Defense counsel's motion to strike the testimony of Dr. Minster was denied.

Dr. Zech, a pathologist, who performed the autopsy on Rita Scholle testified for the defendant. His essential findings were of "massive intracranial hemorrhage due to a ruptured berry aneurysm involving the right middle cerebral artery." It was his opinion that the aneurysm was a congential defect in the wall of the vessel. He could not give an opinion based on a reasonable degree of medical certainty as to what caused the rupture of the aneurysm. On cross-examination he stated that an aneurysm could be present without any symptoms or effect on a person; and that an aneurysm can rupture with a slow leak which would generally produce symptoms such as stiffness of the neck, headaches, and dizziness.

Dr. Kent, a physician and pathologist, also testified for the defendant. He said that the fall of a hypothetical person was symptomatic of the rupture of the aneurysm. However, he admitted that no one could tell with certainty what an independent fall would do to the aneurysm. He said that when an aneurysm is about to rupture, "when it leaks," that it causes symptoms which include headaches, nausea, vomiting, dizziness and loss of control.

Defendant argues that the medical evidence is insufficient to prove the causal relationship between the fall and the rupture of the aneurysm without speculating. Essentially the defendant reasons that the jury

cannot infer a conclusion that the fall caused the aneurysm to break when plaintiff's medical expert was unwilling to reach the same conclusion.

The plaintiff was, of course, required to produce evidence, direct or circumstantial, supporting the allegation that there was a causal relationship between the fall and the ruptured aneurysm. "Liability may not be based on imagination, speculation, or mere conjecture * * *." (*Tiffin v. Great Atlantic & Pacific Tea Co.*, 18 Ill. 2d 48, 60 (1959). See also *Cannell v. State Farm Fire & Casualty Co.*, 25 Ill. App. 3d 907, 911-13 (1975).) If the causal relationship is based on circumstantial evidence, the facts and evidence must reasonably permit the inference of cause and effect upon the part of the jury; but the fact that contrary inferences could be equally supported by the evidence is in itself insufficient to show the unreasonableness of the verdict. (See *Finley v. New York Central R.R. Co.*, 19 Ill. 2d 428 (1960).) In *Finley* the court states, page 436:

> "The fact that contrary inferences would be equally supported by the evidence is not sufficient to show unreasonableness of the verdict. It is the jury's function to weigh contradictory evidence, judge the credibility of the witnesses and draw the ultimate conclusion as to the facts. Its conclusion whether relating to negligence, causation, or any other factual matter should not be set aside merely because different conclusions could be drawn or because judges feel that other results are more reasonable. *Dowler v. New York, Chicago and St. Louis Railroad Co.*, 5 Ill. 2d 125."

See also *Oliver v. Peoples Gas Light & Coke Co.*, 5 Ill. App. 3d 1093, 1098 (1972); *Walsh v. Dream Builders, Inc.*, 129 Ill. App. 2d 280, 290-91 (1970).

■■■ Defendant's underlying theory, however, that if the medical testimony does not establish causation to a reasonable degree of medical certainty causation may not be proved circumstantially, is not well supported. (See *Oliver v. Peoples Gas Light & Coke Co.*, 5 Ill. App. 3d 1093, 1098.) It is, of course, true that an expert witness may not base his opinion upon guess, conjecture or speculation; and that where the expert's opinion is the only evidence of proximate cause he must base his opinion on a reasonable degree of medical certainty to establish the element of causation. (See, *e.g., Sommers v. American Economy Insurance Co.*, 8 Ill. App. 3d 450, 452-53 (1972).) It is also true that a jury may not speculate as to the cause of an injury if the only evidence of causation is sought to be established by the expert testimony and the expert's opinion is insufficient to prove causation by a reasonable degree of medical certainty. (*Sommers v. American Economy Insurance Co.*, 8 Ill. App. 3d 450, 452-53 (1972).) Jurors, however, are permitted to draw inferences based upon their observation and experience in the ordinary affairs of life. (See IPI Civil No. 1.04.) The jury may base its verdict upon a preponderance of all

of the evidence not merely that supplied by expert testimony. *Reivitz v. Chicago Rapid Transit Co.*, 327 Ill. 207, 210-11 (1927).

In the present case, the experts testified to the full extent of their medical knowledge when they established that the fall could have caused the rupture as well as the opposite result. Having done so they had no more information to offer the jury. The effect and weight to be accorded to the fact that the symptoms of the burst aneurysm appeared immediately after decedent's fall thus was completely within the province of the jury and the resolution of the issue did not require expert testimony.

It is undisputed that the medical testimony in the record before us does not establish within a reasonable degree of medical certainty that Rita Scholle's fall at her swimming pool was the proximate cause of her death 12 days after her fall due to the aftermath of a ruptured aneurysm. None of the medical witnesses, however, excluded the possibility that the fall could have caused the aneurysm to burst. The medical testimony thus served to narrow the reasonable probabilities of causation in an area where the limited medical knowledge did not permit an unqualified, unequivocal opinion. Unquestionably it showed that the aneurysm was a congenital weakness in the large blood vessel in the insured's head which could have been caused to burst by her fall and may not have ruptured at any particular time otherwise. It also served to show that an unruptured aneurysm does not cause symptoms; but that upon beginning to rupture the principal initial symptoms are headaches, stiff neck, dizziness, nausea, difficulty in thinking, and loss of muscular control. All of the medical testimony was consistent with the inference that the fall caused the aneurysm to rupture. The medical testimony was also consistent with defendant's theory that the rupturing of the aneurysm caused the insured's dizziness and resulted in her fall. Since there were two inferences both equally supported by the evidence the jury could draw the ultimate conclusion if the circumstantial evidence supported its verdict. See *Finley v. New York Central R.R. Co.*, 19 Ill. 2d 428, 436.

■■ The jury's inference that the fall caused the aneurysm to rupture was not the only conclusion but nevertheless was a reasonable conclusion from the circumstances. Mrs. Scholle was in apparent excellent health prior to her fall. on October 30, 1971, and there was evidence that immediately after her fall she developed symptoms of a ruptured aneurysm which led to her death 12 days later. Proof of a state of health prior to an injury with a following change is competent as tending to establish that the impaired condition was due to the trauma (*Plano Foundry Co. v. Industrial Com.*, 356 Ill. 186, 198-99 (1934)). In *National Castings Division of Midland-Ross Corp. v. Industrial Com.*, 55 Ill. 2d 198 (1973), where the circumstances were similar to those before us, the court noted that the medical testimony showed that the origin of the multiple

sclerosis was unknown, that trauma could accelerate a latent condition of multiple sclerosis but that the medical witnesses differed as to the degree of trauma which would be necessary. However, the proof of change in the condition of the plaintiff's health following the injury was the circumstantial evidence which supported the workmen's compensation award. The court stated at page 204:

> "Where, as here, there exists limited medical knowledge of a malady, we have recognized that medical testimony pertaining to causation may not be unqualified and unequivocal.* * * "

■■ We conclude that the judgment is a proper one when measured by the *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)), which applies to the trial court's denial of defendant's motion for a judgment notwithstanding the verdict; or when measured by the manifest weight of the evidence test applicable to the defendant's motion for a new trial.

■■ It also follows that the trial court did not err in refusing to strike the testimony of Dr. Minster on the ground that he could not establish with any reasonable degree of medical certainty that the aneurysm ruptured because of the fall. As we have noted, his testimony established the limited proposition that the aneurysm could have burst as a result of the fall. Inasmuch as the circumstantial evidence supported a reasonable inference that the fall caused the rupture, a result which could not be completely ruled out as a cause of the injury by the medical testimony, Dr. Minster's testimony was admissible. *Oliver v. Peoples Gas Light & Coke Co.*, 5 Ill. App. 3d 1093, 1097; *cf. National Casting Division of Midland-Ross Corp. v. Industrial Co.*, 55 Ill. 2d 198 (1973).

*Sugarman v. New England Mutual Life Insurance Co.*, 201 F. Supp. 759 (E.D. N.Y. 1962), cited by the defendant does not require a contrary conclusion. In *Sugarman* there was no evidence from which it could be inferred that the decedent's fall was due to an accident. The decedent exhibited symptoms of a ruptured aneurysm, although undiagnosed as such, prior to his fall. Further, in that case the medical evidence did not even establish the possibility that the decedent's fall had caused his aneurysm to rupture. Under these circumstances the court properly concluded that the plaintiff failed to meet his burden of proof.[1]

■■ The trial court also did not commit reversible error when it refused to permit defendant's counsel to ask Dr. Minster to characterize

---

[1] The *Sugarman* holding is also based upon an interpretation of the terms of the contract. The court held that even if an accidental fall caused the aneurysm to rupture, the qualitative significance of the aneurysm in producing death would preclude recovery. (201 F. Supp. 759, 761-72.) We do not reach the issue of whether the qualitative role of the aneurysm was great enough to preclude recovery under this policy. Defendant raises only the issue of causation of the rupture and does not argue that decedent's condition made her particularly susceptible to trauma.

his own testimony as speculation. In view of the extensive cross-examination of Dr. Minster in which it clearly appeared that the doctor could not definitely conclude that the fall caused the aneurysm to rupture the question was of very doubtful relevance. In any event no prejudice could have resulted from the refusal to require the witness to characterize his own testimony. See *Ross v. Pfeifer*, 39 Ill. App. 3d 789, 793 (1976); *Miceikis v. Field*, 37 Ill. App. 3d 763, 771 (1976).

The judgment is therefore affirmed.

Affirmed.

GUILD, P. J., and RECHENMACHER, J., concur.

SUPPLEMENTAL OPINION UPON DENIAL OF REHEARING

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

■■ In its petition for rehearing, Continental contends that the court's original opinion contains language which is suggestive of a departure from the well-established principle that a plaintiff in a civil case must prove the material allegations of his complaint by a preponderance of the evidence. *Reivitz v. Chicago Rapid Transit Co.*, 327 Ill. 207, 209-11 (1927).

We adhere to our holding that the proofs were sufficient to support a finding that Mrs. Scholle's fall caused the rupture of the aneurysm which resulted in her death and that the defendant's motions for judgment notwithstanding the verdict and for a new trial were properly denied. We believe the appellant has misapprehended some of the language in the original opinion. No departure from the established rules governing the burden of proof in civil cases was intended.

As noted in the original opinion, the defendant's theory of the case was that the aneurysm ruptured as Mrs. Scholle was leaning over the pool, thus causing her to lose her balance and to be unable to take proper corrective action. The medical experts were unable to state within a reasonable degree of medical certainty what caused Mrs. Scholle's aneurysm to burst; however, none of the experts ruled out the possibility that the fall could have caused the aneurysm to rupture. On this record, in view of the limited medical knowledge with regard to the causes of aneurysm ruptures, it cannot be said that the medical testimony was pure conjecture. (Compare *Quaker Oats Co. v. Industrial Co.*, 414 Ill. 326, 335 (1953), with *Sommers v. American Economy Insurance Co.*, 8 Ill. App. 3d 450, 452-53 (1972).) However, *based on the medical testimony alone*, the inferences that the fall did or did not cause the aneurysm to burst could have been drawn with equal certainty. Thus, the plaintiff was

obliged to resort to circumstantial evidence to prove that it was more probable than not that the fall caused the rupture of the aneurysm.

"The sole limitation on the use of circumstantial evidence is that inferences drawn therefrom must be reasonable." (*Pearson v. Ford Motor Co.*, 32 Ill. App. 3d 188, 191 (1975).) It is not required that circumstantial evidence both create a reasonable inference of the fact to be shown and also exclude all other possible inferences. (*Olsen v. Pigott*, 39 Ill. App. 2d 191, 196 (1963); *Pearson v. Ford Motor Co.*, 32 Ill. App. 3d 188, 191 (1975).) "[A]ll that can be reasonably required to establish controverted facts, whether the evidence be direct or circumstantial, is that the evidence creates a greater or less probability leading, on the whole, to a satisfactory conclusion." *Lindroth v. Walgreen Co.*, 407 Ill. 121, 134 (1950).

The evidence in support of defendant's theory that the aneurysm caused the fall was medical testimony to the effect that a fall could be a symptom of a leaking aneurysm. When viewed in the light of Mrs. Scholle's precarious position at the time she lost her balance and the other evidence, we cannot say that the jury's conclusion that it was more probable than not that the fall caused the aneurysm to rupture was unsupported by the evidence and the result of mere speculation or conjecture.

The petition for rehearing is therefore denied.

GUILD, P. J., and RECHENMACHER, J., concur.