**Pamela Hertel MERS, Plaintiff,**

v.

**MARRIOTT INTERNATIONAL GROUP ACCIDENTAL DEATH AND DISMEMBERMENT PLAN, Marriott International, Inc., American International Group, and American International Companies, Defendants.**

No. 95 C 7543.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 5, 1996.

Donald C. Clark, Jr., Jennifer Susan Holloway, Clark & DeGrand, Chicago, IL, for Pamela Hertel Mers.

P. Kevin Connelly, David N. Michael, Connelly, Sheehan & Moran, Chicago, IL, for Marriott International Group Accidental Health and Dismemberment Plan, American International Group.

Robert J. Trizna, Michael Daehyun Lee, Trizna & Lepri, Chicago, IL, for Marriott International, Inc.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff Pamela Hertel Mers ("Mers") asserts that Defendant Marriott International Group Accidental Death and Dismemberment Plan (the "Plan") wrongfully denied her claim for benefits under the Plan's Business Travel Accident Insurance Policy, in which Mers' deceased husband, Dale Mers, was enrolled. Accordingly, in Count I of her Complaint, Mers seeks payment of those benefits from the Plan pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)($l$)(B).[1] Now before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, the Court grants the Plan's, and denies Mers', summary judgment motion.

[1] Mers originally attempted to assert claims against the Plan, Marriott International, Inc. ("Marriott"), American International Group ("AIG") and American International Companies ("AIC") for breach of fiduciary duty in violation of ERISA. By Orders dated April 26, 1996 and

### BACKGROUND

The following facts, taken from the parties Local Rule 12(M) and 12(N) statements, are largely undisputed by the parties. The Plan is a welfare-benefit plan provided by Marriott for its employees; the Plan is subject to, and governed by, ERISA. The Plan offers Marriott employees two types of accidental death insurance policies: (1) a Business Travel Accident policy (the "BTA Policy") that provides protection for death or dismemberment resulting from an accident while an employee is travelling on company business; and (2) an Optional 24–Hour Policy (the "24–Hour Policy") that provides round-the-clock protection for death or dismemberment resulting from an accident, regardless of whether the employee is travelling on company business at the time of his or her injury.

All full-time Marriott employees automatically are enrolled in the BTA Policy—those employees earning $30,000 or more per year being eligible for up to $100,000 in benefits, and those employees earning less than $30,000 per year being eligible for up to $50,000 in benefits. Enrollment in the 24–Hour Policy is not automatic, however; interested employees must authorize premium deductions from their paychecks in order to obtain coverage.

Dale Mers was employed by Marriott as a Director of National Accounts. As a full-time Marriott employee earning more than $30,000 a year, Dale Mers was enrolled automatically in the BTA Policy and was eligible for up to $100,000 in benefits under that policy. Dale Mers also enrolled in the 24–Hour Policy for up to $100,000 in benefits; premiums for the 24–Hour Policy were regularly deducted from Dale Mers' paycheck. Mers was her husband's designated beneficiary.

On January 5, 1994, Dale Mers checked into a Chicago hotel to attend a five-day conference of the Professional Convention

June 19, 1996, however, this Court dismissed those claims—Counts II and III of Mers' Complaint—pursuant to Fed.R.Civ.P. 12(b)(6). Thus, only Mers' Count I, ERISA claim for wrongful denial of benefits under the Policy remains.

Management Association ("PCMA"). Dale Mers' PCMA dues were paid by Marriott and his involvement in the organization and attendance at the conference were undertaken in furtherance of Marriott's business. As part of the PCMA conference, Dale Mers participated in a Habitat for Humanity project on January 5, using a sledge hammer and crow-bar to tear down a plaster and lath wall. While engaged in this strenuous activity, Dale Mers collapsed. He died the next day, January 6, 1994, at St. Francis Hospital. Dale Mers' death certificate lists the cause of death as cardiac arrest due to, or as a consequence of, cerebral hemorrhage; no autopsy was performed. At the time of his death, Dale Mers was 44 years old, was feeling well, and, other than suffering from mild, non-insulin diabetes, was in good physical health.

Soon after Dale Mers' death, Mers was told by Marriott that her husband possessed only $100,000 in accidental death coverage. Mers, allegedly unaware that her husband had enrolled in the 24–Hour Policy, assumed this $100,000 coverage to be under the BTA Policy.

On or about March 2, 1994, Mers, following the procedures set forth in the Summary Plan Description, filed a claim for benefits with Marriott. Marriott apparently delegated responsibility for resolving factual questions and determining Mers' eligibility for Plan benefits to AIC (a subsidiary of AIG, the Plan's insurer), who, in turn, retained the services of Equifax, a claims service.

In submitting Mers' claim to the Plan, Marriott included only a copy of Dale Mers' enrollment form for the 24–Hour Policy. Marriott errantly failed to notify the Plan of Dale Mers' enrollment in the BTA Policy and did not file a formal claim with the Plan for BTA Policy benefits. Thus, in evaluating Mers' claim for benefits, the Plan considered only the terms of the 24–Hour Policy; the Plan did not realize that Mers had a potential claim for benefits under the BTA Policy.

On August 3, 1994, AIC wrote Per K. Hanson ("Hanson"), Mers' attorney, and advised him that, based upon its investigation of the circumstances surrounding Dale Mers' death, its review of Dale Mers' medical records, and its receipt of the medical opinions of Drs. Daniel Hier, M.D. and Jack Harnes, M.D., AIC had concluded that Mers was ineligible for benefits under the terms of the Plan. Specifically, AIC informed Hanson that, "In·so far [sic] as Mr. Mers' exertion exacerbated a pre-existing condition [an intracranial aneurysm], we must conclude that Mr. Mers' death was not independent of all other causes of loss." (Ex. 7, Def. 12(M) Statement, p. 2.)

Mers appealed the Plan's denial and submitted for the Appeals Committee's consideration a September 16, 1994 letter from Dr. Allan B. Aven, M.D., S.C., who stated as follows:

> This individual performed a series of extremely physically demanding activities during which increased vascular pressures were transmitted from the abdomen and chest into the vascular system of the brain (a Valsalva maneuver). This may have caused a blood vessel, previously weakened (by cholesterol plaque or congenital dysplasia) to rupture. On the other hand, had this person continued in his usual and customary lifestyle, the vascular rupture would not have suddenly happened.

(Ex. 4, Def. 12(M) Statement, p. 1.) AIC forwarded Dr. Aven's letter to Dr. Harnes, AIC's medical consultant, for review. Dr. Harnes reported back to AIC that, "Dr. Aven argues that a pre-existing condition, aggravated by exertion, caused [Dale Mers'] hemorrhage. Since the hemorrhage would thus not be independent of the pre-existing disease hypothesized by Dr. Aven, I fail to see why his letter should change our position." (Ex. 12, Def. 12(M) Statement.)

Based upon its review of the full administrative record, the Appeals Committee reaffirmed the denial of benefits to Mers under the 24–Hour Policy. Mers was informed on the Appeals Committee's decision by letter dated December 8, 1994.

Mers filed her Complaint with this Court on December 22, 1995. After much initial confusion, both parties now agree that Mers' Count I seeks payment of benefits only under the BTA Policy. On August 29, 1996, the Plan filed its motion for summary judgment, asserting that (1) Mers' claim is premature,

as she failed to exhaust her administrative remedies by filing a claim under the BTA Policy with the Plan; or, alternatively, (2) because the Plan's determination that Dale Mers' death did not result independently of all other causes of loss was not "downright unreasonable," the Plan's denial of benefits must be affirmed, as a matter of law, using the deferential, "abuse of discretion" standard of review. On September 26, 1996, Mers filed her motion for summary judgment, contending that (1) given AIC's inherent conflict of interest in evaluating Mers' claim for benefits, the Plan's denial must be reviewed *de novo*, rather than under an "arbitrary and capricious" standard; and (2) because Dale Mers' death was caused by his unusually strenuous work activity at the Habitat for Humanity project and was wholly unexpected and unforeseeable, his death constitutes an "accident" within the meaning of the BTA Policy—an accident for which she is entitled, as a matter of law, to payment of benefits.

## DISCUSSION

### A. Standards for Summary Judgment

Summary judgment is appropriate where the pleadings, answers to interrogatories, admissions, affidavits, and other materials show that there is "no genuine issue as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are those that might affect the outcome of the suit under governing law. *Id.* A "genuine issue" exists if there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2511. When considering a motion for summary judgment, the Court must view the facts, and all the inferences drawn from those facts, in the light most favorable to the nonmovant. *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991); *Roman v. U.S. Postal Service*, 821 F.2d 382, 385 (7th Cir.1987).

### B. Mers' Failure To Exhaust Her Administrative Remedies

The parties agree that Mers has failed to exhaust her administrative remedies, as Mers (through circumstances arguably beyond her control) never has presented her claim for benefits under the BTA Policy to the Plan fiduciaries and/or administrator for consideration. Exhaustion of administrative remedies prior to filing suit generally is required because it (1) "enhances the ability of plan fiduciaries to expertly and efficiently manage their plans by preventing premature judicial intervention," *Powell v. AT & T Comm., Inc.*, 938 F.2d 823, 826 (7th Cir. 1991); (2) assists the courts by ensuring that a plaintiff's claims have been "fully considered" by plan fiduciaries, *Id.*; and (3) "gives effect to Congress' apparent intent, in mandating internal claims procedures, to minimize the number of frivolous lawsuits, to promote consistent treatment of claims, to provide a nonadversarial dispute resolution process, and to decrease the cost and time of claims settlement." *Wilczynski v. Lumbermens Mutual Cas. Co.*, 93 F.3d 397, 402 (7th Cir.1996). Consequently, the Seventh Circuit has made clear that "application of the exhaustion doctrine ... is a matter within the discretion of the trial court," and that "as a matter of sound policy [the court] should usually [apply it]." *Kross v. Western Elec. Co., Inc.*, 701 F.2d 1238, 1244–45 (7th Cir. 1983). Yet, courts should not, and generally will not, invoke the exhaustion doctrine to dismiss a claim for benefits where utilizing a Plan's internal procedures would yield an inadequate remedy or where pursuing administrative avenues would be, at best, a futile gesture. *See Smith v. Blue Cross & Blue Shield United of Wis.*, 959 F.2d 655, 658–59 (7th Cir.1992); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 466 (7th Cir.1986).

Here, there can be little doubt that any effort by Mers to recover benefits under the BTA Policy directly from the Plan would be futile. The Plan makes abundantly clear in its various briefs and in its statements to this Court that it would have denied (and, if given the opportunity, will deny) Mers' claim under the BTA Policy, as that policy contains the identical basic coverage and exclusion lan-

guage on which the Plan based its denial of benefits under the 24–Hour policy. Thus, it would be extraordinarily wasteful and grossly inefficient to dismiss Mers' suit at this late stage and to require Mers to present her BTA Policy claim to the Plan fiduciary; the Plan's position is certain and, by its own admission, unwavering—Mers cannot recover benefits from the Plan for Dale Mers' death because his death was not caused by an accident, independent of all other causes.

## C. *Appropriate Standard For Reviewing The Plan's Denial Of Benefits*

 Actions challenging the denial of benefits under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), are subject to the standard of review announced in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In *Firestone,* the Supreme Court observed that "a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a *de novo* standard." *Firestone,* 489 U.S. at 115, 109 S.Ct. at 956. Where, however, discretion to interpret ERISA plan terms is reserved by, or delegated to, a plan administrator or fiduciary, courts are required to review those interpretations applying an "arbitrary and capricious" standard. *Id.; Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 441 (2d Cir.1995). The Seventh Circuit recently said about *Firestone:*

> [T]he court announced that the arbitrary and capricious standard of review was to be replaced by de novo review unless the terms of the agreement granted the fiduciary discretion in the award or denial of benefits.... When the fiduciary has discretion, we review its decisions for abuse.... As in trusts law, whether something constitutes an abuse depends on the terms of the instrument; the more discretion that is conferred upon the trustee or fiduciary, the more deference the consequent decision is entitled.... [When] the amount of discretion is virtually unconstrained, the court should review the decision under an arbitrary and capricious standard.... Under that standard we evaluate several factors: The impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination.

*Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1343–44 (7th Cir.1995).

The parties agree that Marriott is the Plan sponsor, that Marriott and AIG are the Plan's named fiduciaries, and that the Corporate Benefits Department of Marriott is the Plan Administrator. The parties further recognize that the Summary Plan Description, which sets forth the terms of both the BTA Policy and the 24–Hour policy, (1) gives Marriott "sole, absolute and final discretion to determine eligibility for benefits and to resolve any factual issues relevant to benefit eligibility or benefit enrollment"; and (2) grants AIC "sole, absolute and final discretion to construe the terms of the Plan." (Ex. H, Pltf. 12(M) Statement, p. 3) Thus, this Court must review the Plan's decision to deny coverage for Dale Mers' death under the deferential "arbitrary and capricious" standard.

While Mers maintains that her present claim should be reviewed *de novo* because the Plan was never presented with, and, thus, did not specifically deny, a claim for benefits under the BTA Policy, Mers conveniently ignores the fact that the Plan denied her claim under the 24–Hour Policy based upon its conclusion that Dale Mers' death was not caused by an accident, independent of other causes—a conclusion that similarly bars payment of benefits under the basic coverage and exclusionary language of the BTA Policy. Indeed, in her successful effort to side-step application of the administrative exhaustion doctrine to her present action, Mers explicitly recognizes that the formal presentation of a claim under the BTA Policy would be futile in light of AIG's stated interpretation of the Plan's terms and its unequivocal resolution of the factual issues pertaining to Dale Mers' death. Hence, the Plan's decision to deny coverage under the 24–Hour Policy effectively operates to deny coverage under the BTA Policy, and, as a result, Mers' present claim—a claim that necessarily requires this court to review the propriety of the Plan's

decision under the 24–Hour Policy—is subject to the "arbitrary and capricious" standard of review.[2]

■ Mers correctly points out, however, that this Court should afford less deference to, and should view with greater suspicion, the Plan's decision to deny coverage for Dale Mers' death because AIC was operating under a conflict of interest when it denied Mers' claim. As previously indicated, AIC—the company to whom Marriott delegated responsibility for resolving factual questions and determining eligibility for benefits—is a subsidiary of AIG—the Plan's insurer. Consequently, the Court presumes that AIC, when considering Mers' request for benefits, was, in fact, presented with a conflict of interest:

> Courts have found substantial potential for conflict to exist where a plan administrator or fiduciary serves the dual roles of a decision-maker with regard to the granting or denial of claims and an insurer "which must constantly strive to make its revenues exceed its costs."

*Velez v. Prudential Health Care Plan of New York, Inc.,* 943 F.Supp. 332, 339 (S.D.N.Y. 1996) (quoting *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1561 (11th Cir.1990)).

Yet, AIC's inherent ·conflict does not, as Mers' contends, change the standard of review from arbitrary and capricious to *de novo;* rather, it merely is a factor to be considered in determining whether the Plan abused its discretion in denying Mers' benefit claim. As explained by the Seventh Circuit:

> [F]lexibility in the scope of judicial review need not require a proliferation of different standards of review; the arbitrary and

capricious standard may be a range, not a point. There may be in effect a sliding scale of judicial review of trustees' decisions—more penetrating the greater the suspicion of partiality, less penetrating the smaller that suspicion is.

*Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1052 (7th Cir. 1987); *see also Velez,* 943 F.Supp. at 339–40; *Swaback v. American Information Tech. Corp.,* 1995 WL 769784, at *7 (N.D.Ill.Dec.29, 1995); *Kost v. Prudential Ins. Co. of America,* 1995 WL 359934, at *1 (N.D.Ill. June 13, 1995).

### D. Reasonableness Of The Plan's Decision To Deny Coverage ·

■ Regardless of the degree of deference that should be afforded the Plan's decision, Mers has the initial burden of showing that the Plan's conclusions are legally and/or factually wrong and that Dale Mers' death falls within the terms of the· policy. *See Van Boxel,* 836 F.2d at 1053 ("[t]he greater the conflict of interest ... the less we defer to a denial of benefits that appears to be wrong"); *Brown,* 898 F.2d at 1556 ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary"); *see also Wahls v. Aetna Life Ins. Co.,* 122 Ill. App.3d 309, 311, 77 Ill.Dec. 843, 461 N.E.2d 466 (1984) ("plaintiff has the burden of proving that decedent died as a result of an accidental bodily injury within the terms of the subject policy.").[3] Both the 24–Hour Policy and the BTA Policy clearly state that their coverage applies only to "injury," [4] and both policies define "injury" as follows:

---

2. It should be noted that if Mers were now seriously to contend either that the Plan's factual conclusions do not operate to preclude Mers' recovery under the BTA Policy or that the Plan might consider certain matters, apply different factors, and/or interpret different terms with respect to a claim under the BTA Policy than it did with respect to Mers' claim under the 24–Hour Policy, then a formal request by Mers to the Plan for benefits under the BTA Policy would not be futile, and, accordingly, the Court would dismiss Mers' present claim for her failure to exhaust her administrative remedies.

3. Significantly, the interpretation of an insurance policy presents a question of law to be decided by the Court. *Cincinnati Ins. Co. v. Flanders Electric Motor Service, Inc.,* 40 F.3d 146, 150 (7th Cir.1994); *Transamerica Ins. Co. v. South,* 975 F.2d 321, 326 (7th Cir.1992).

4. The BTA Policy's coverage is further limited to injury "sustained by such person anywhere in the world while on the business of the Policyholder and during the course of any bonafide trip made by the Insured Person." (BTA Policy, Section II, Part B.)

"Injury" wherever used in the policy means bodily injury caused by an accident and resulting directly and independently of all other causes in loss covered by the policy,....

(BTA Policy, Section II, Part A; 24–Hour Policy (version PAI 8043756), Part I.)[5] The policies further provide that they do "not cover any loss, fatal or non-fatal, caused by or resulting from ... disease of any kind...." (BTA Policy, Section IV; 24–Hour Policy (version BAI 8043756), Part III.) Thus, to mount even a credible challenge to the Plan's denial of benefits, Mers' must, at a minimum, satisfy her burden of showing that Dale Mers' death—the claimed loss—(1) was caused by an "accident," (2) resulted directly and independently of all other causes in loss, and (3) was not caused by and did not result from a disease of any kind.

### 1. Dale Mers' death was caused by an "accident"

Getting a firm handle on the term "accident" as it is used in accidental death and dismemberment insurance polices apparently has been extremely difficult for the courts. In the "old days," courts often distinguished between accidental means—that is, unplanned, unexpected and/or unintended acts or events which cause losses—and accidental results—that is, unanticipated losses resulting from voluntary and/or planned acts—; injuries caused by accidental means typically were covered, while injuries caused by accidental results generally were not. This means-end distinction eventually was replaced in many courts by a standard of foreseeability—losses that were not reasonably foreseeable by the insured person, whether the products of accidental means or accidental results, were covered as "accidental injuries."

The Seventh Circuit specifically has counseled against rigid adherence to any one of these tests for "accidental injury," however, advising, instead, that the term "accident" be defined by reference to "common understanding":

Maybe the tests [accidental means, accidental results, foreseeability] are no good. That is what Justice Cardozo thought. He thought courts could do no better than to leave the question to "common understanding as revealed in common speech." *Connelly v. Hunt Furniture Co.*, 240 N.Y. 83, 85, 147 N.E. 366, 367 (1925). We agree. The insured ought to know what he is getting in his insurance policy, so that he can decide whether he would like more coverage at a higher price or less at a lower price. A lay person has a clear if inarticulate understanding of the difference between an accidental death and a death from illness, and that understanding will not be altered or improved by head-spinning judicial efforts at definition, such as the mysterious attempt by a court in this state to define disease as that which "originates from a source that is neither traumatic nor physical." *Luttrell v. Industrial Commission*, 154 Ill.App.3d 943, 955, 107 Ill.Dec. 620, 629, 507 N.E.2d 533, 542 (1987). A person can tell time without being able to define "time" and he can know how to ride a bicycle or shoot pool without being able to explain the principles of physics that enable him to do these things. He can also classify a death as the consequence of illness or accident without being able to define either term.

*Senkier,* 948 F.2d at 1052–53 (citations omitted).

In *Haley v. American Int'l Life Assurance Co. of New York,* 789 F.Supp. 260 (N.D.Ill. 1992), this Court, in holding that a fatal heart attack, absent a triggering event, could not be considered an accidental injury, attempted to shed some light on the common understanding of the term "accident":

---

5. Mers asserts that the Plan is estopped from relying on the BTA Policy's definition of "injury" because that term does not appear in the Summary Plan Description ("SPD"). Yet, the Seventh Circuit has made clear that the language of the SPD controls over the language of the underlying insurance policy "only if there is a contradiction between the summary plan document and the policy." *Senkier v. Hartford Life & Accident Ins. Co.,* 948 F.2d 1050, 1051 (7th Cir.1991). Here, the language of the BTA Policy's language does not contradict the SPD; rather, it merely clarifies that the loss and accidental loss language in the SPD means "loss resulting from injury." (Ex. H, Pltf. 12(N) Statement, pp. 27–28; BTA Policy, Section III.)

The word "'accident' normally designates an unforeseen occurrence, usually of untoward or disastrous character, or an undesigned sudden or unexpected event of an inflictive or unfortunate character.... The natural and ordinary consequences of an act do not constitute an 'accident.'" *Farmers Elevator Mutual Life Ins. Co. [Farmers Elevator Mutual Ins. Co.] v. Burch,* 38 Ill.App.2d 249, 252, 187 N.E.2d 12 (4th Dist.1972); .... As a general rule, in the absence of any unexpected or unforeseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident.

*Haley,* 789 F.Supp. at 263 (citations omitted).

■ In the present case, the parties agree that Dale Mers' death was caused by cardiac arrest due to, or as a consequence of, cerebral hemorrhage; and the medical evidence and expert opinions presented by the parties and relied upon by AIC all suggest that the cerebral hemorrhage resulted from the rupture of a previously weakened blood vessel—an aneurysm—in Dale Mers' brain due to increased vascular pressure caused by his unusual physical exertion at the Habitat for Humanity project. Dale Mers certainly did not expect, and could not have foreseen, that his participation in the project would result in his death—he did not have any knowledge of the existence of an aneurysm—; and, as opined by Dr. Aven, had Dale Mers not engaged in such strenuous activity at the project, the vascular rupture would not suddenly have happened. A number of courts have found analogous deaths resulting from exertion induced ruptures of pre-existing aneurysms to be "accidents." *See, e.g., Carroll v. CUNA Mutual Ins. Society,* 894 P.2d 746, 753 (Colo.1995); *Scholle v. Continental Nat'l American Group,* 44 Ill. App.3d 716, 3 Ill.Dec. 350, 355–56, 358 N.E.2d 893, 898–99 (1976); *Zorn v. Aetna Life Ins. Co.,* 260 F.Supp. 730, 733 (E.D.Tex.

1965). This Court similarly concludes that Dale Mers' death was accidental (as that term is commonly understood), as it was triggered by unusual physical activity and it was not, and, indeed, could not, reasonably have been foreseen or expected. Utilizing an appropriately less deferential arbitrary and capricious standard, the Court thus finds the Plan's apparent determination that Dale Mers' death was not caused by an accident to be unreasonable.

2. *Dale Mers' death did not result directly and independently of all other causes in loss*

■ As previously explained, it is not enough for Mers to show that the Plan was wrong to conclude that Dale Mers' death did not result from an accident; instead, Mers must also show that the Plan abused its discretion in concluding that Dale Mers' death did not result directly and independently of all other causes in loss, including disease.[6] Mers fails to make this necessary showing.

Each and every one of the expert opinions offered by the parties suggests that Dale Mers' cerebral hemorrhage was caused by a ruptured aneurysm—an aneurysm which, by definition, existed prior to, and independent of, Dale Mers' participation in the Habitat for Humanity project on January 5, 1994. Dr. Hier, for example, stated that, "The likely cause of this intracerebral hemorrhage and death is either a sudden rise in blood pressure or a ruptured arterial aneurysm." (Ex. 1, Def. 12(M) Statement, p. 2.) Dr. Aven opined that, "Since an autopsy was not performed at the time of death, we can only assume from the CT brain scan that the blood within the brain came from an acute hemorrhage, possibly from a ruptured cerebral aneurysm or an arteriosclerotic-weakened vessel." (Ex. 4, Def. 12(M) Statement, p. 2.) Finally, Dr. Harnes stated:

---

6. Recently, in *Hightshue v. AIG Life Ins. Co.,* 939 F.Supp. 1350, 1996 WL 534827, at *9 (S.D.Ind. 1996), the court stated:

Clearly, this sentence [resulting directly and independently of all other causes in loss covered by the policy] merely requires that an injury must result "directly" and "indepen-

dently of all other causes" to be covered by the Plan. In other words, this definition simply limits coverage to bodily injuries resulting directly from an accident and independently of any other case.... A person of average intelligence and experience would understand this definition to have the meaning stated....

I cannot agree with the opinion of Dr. Hier that this man's stroke resulted from hypertension due to excessive work. If, as he hypothesizes, the stroke resulted from a subarachnoid hemorrhage secondary to an aneurysm, that bleeding would not be independent of his pre-existing congenital abnormality. Further should the intracerebral hemorrhage be attributed to hypertension, I believe that it would be such an uncommon event in a healthy man of this age that one would have to admit that increased arteriosclerosis resulting from his long standing diabetes played some role in a ruptured cerebral blood vessel.

(Ex. 8, Def. 12(M) Statement.)

The few courts presented with deaths caused by similar physical conditions have held that such deaths cannot be said to have resulted directly and independently of all other causes in loss covered by an accidental death policy. In *Carroll v. CUNA Mutual Insurance Society,* 894 P.2d 746 (Colo.1995), for example, the court held that a woman's death, which resulted from a massive intracranial hemorrhage caused in turn by the rupture of a preexisting cerebral aneurysm during sexual intercourse with her husband, was not a covered event under an accidental death insurance policy. The court explained:

The proper interpretation of the clause "directly and independently of all other causes" is that contained in [*Continental Casualty Co. v. Maguire,* 28 Colo.App. 173, 471 P.2d 636 (Colo.App.1970) ]. Benefits under accidental death or injury policies of the type at issue here are recoverable as long as one can show that the accident is the predominant cause of the loss.

* * *

The evidence even when considered in the light most favorable to Mr. Carroll supports the trial court's findings, which in turn establish that the predominant cause of Mrs. Carroll's death was her preexisting aneurysm and hypertension. Mr. Carroll has not sustained his burden of proving by a preponderance of the evidence that Mrs. Carroll's death was caused "directly and independently of all other causes."

*Carroll,* 894 P.2d at 754–55, 756.

In *Zorn v. Aetna Life Ins. Co.,* 260 F.Supp. 730 (E.D.Tex.1965), the court similarly denied benefits to the beneficiary of an accidental death insurance policy whose husband, the insured person, died when his extraordinary physical exertion—he was attempting to handcrank an engine—caused a preexisting cerebral aneurysm to burst. The court stated:

As indicated by the above quoted provisions of ... the policy (the exclusionary clause), no insurance is provided and no benefits are payable with respect to any loss if such loss results from an injury which was caused or contributed to by or as a consequence of any "bodily infirmity" or "disease of any kind," even though the proximate or precipitating cause of said loss was a bodily injury caused by an accident.

* * *

An abnormal weakness in the wall of a blood vessel plainly falls within such definition. Thus, the Court finds and concludes that the preexisting aneurysm in the blood vessel in Zorn's brain constituted a 'bodily infirmity' within the meaning of the exclusionary clause of the insurance policy, and since Zorn's injury was contributed to by said aneurysm, Aetna is not liable for the payment of the death benefits provided for in the policy in question.

*Zorn,* 260 F.Supp. at 733.

Finally, the court in *Sugarman v. New England Mutual Life Ins. Co.,* 201 F.Supp. 759 (E.D.N.Y.1962), concluded that an insured's death caused by the rupture of an undetected, congenital aneurysm when the insured struck his head on a staircase was not covered by an accidental death insurance policy containing a disease exclusion substantially similar to the one in both the BTA Policy and the 24–Hour Policy. The *Sugarman* court wrote:

None of the cases authorizes a conclusion that death from the rupture of such an aneurysm as the insured unknowingly harbored can be found as a fact to be death due to injury effected solely through accidental means and not resulting wholly or partly, directly or indirectly from any disease or infirmity. As a matter of law the

morbidity of the artery bearing the aneurysm the rupture of which caused death was a grave infirmity or disease; its role in producing death precludes recovery even if an accidental blow or fall produced the increase in intracranial pressure that effected the fatal rupture of the aneurysm. *Sugarman*, 201 F.Supp. at 762; *see also Criss v. Hartford Accident & Indem. Co.*, 1992 WL 113370, *2–4, *6 (6th Cir.1992); *McFarlane v. Life Ins. Co.*, 999 F.2d 266, 267 (7th Cir.1993).

Thus, as with the deceased insureds in *Carroll, Zorn,* and *Sugarman*, it cannot be said that Dale Mers' death resulted directly and independently of all other causes in loss and/or that his death was not caused by and did not result from a disease of any kind. At the very least, even under a less deferential arbitrary and capricious standard of review that accounts for AIC's inherent conflict of interest, this Court concludes, as a matter of law, that the Plan's determinations (1) that Dale Mers' death was caused, in large part, by a preexisting condition, infirmity or disease (i.e. either an aneurysm or an arteriosclerotic-weakened blood vessel) and (2) that, consequently, his death was not covered by the 24–Hour or the BTA Policies were entirely reasonable and appropriate in light of the available medical evidence, the largely undisputed facts, and the relevant judicial precedent.[7] Accordingly, summary judgment should be granted in favor of the Plan and against Mers.

### CONCLUSION

For the foregoing reasons, the Court grants the Plan's motion for summary judgment and denies Mers' motion for summary judgment.

---

7. Although Mers repeatedly argues that because the BTA Policy is ambiguous as to the precise scope of its coverage, the Policy should be construed strictly in favor of coverage and against the Plan—a concept typically referred to as the doctrine of *contra proferentem*—, this argument has been explicitly rejected by the Seventh Circuit where, as here, discretion is granted to plan administrators and/or fiduciaries to interpret the plan's terms:

> The federal common law of ERISA does provide that ambiguous terms in benefit plans should be construed in favor of beneficiaries. But this rule has no application here. Often called the rule of contra proferentem, it is a device for determining the intended meaning of a contract term in the absence of conclusive evidence about intent. Courts invoke this rule when they have the authority to construe the terms of a plan, but this authority arises only when the administrators of the plan lack the discretion to construe it themselves.... When the administrators of a plan have discretionary authority to construe the plan, they have the discretion to determine the intended meaning of the plan's terms. In making a deferential review of such determinations, courts have no occasion to employ the rule of contra proferentem.

*Morton v. Smith*, 91 F.3d 867, 871 n. 1 (7th Cir.1996).