Nancy J. KOLOWSKI, Robert Kolowski
and Joshua Kolowski Plaintiffs,

v.

METROPOLITAN LIFE INSURANCE
COMPANY, Defendant.

No. 97 C 6811.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 24, 1998.

Robert M. Foote, Craig S. Mielke, Murphy, Hupp, Foote, Mielke & Kinnally, Aurora, IL, for Plaintiffs.

Thomas James Piskorski, Joshua Mark Henderson, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant.

*MEMORANDUM OPINION
AND ORDER*

MAROVICH, District Judge.

Plaintiffs Nancy J. Kolowski, Robert H. Kolowski, and Joshua M. Kolowski (collectively "Plaintiffs"), filed this insurance coverage action against Defendant, Metropolitan Life Insurance Company ("MetLife"), alleging that MetLife breached its duty to fully indemnify them as the beneficiaries of a life insurance policy issued to the decedent, Robert L. Kolowski.[1] MetLife now moves for summary judgment pursuant to Fed.R.Civ.P. 56(c). For the reasons set forth below, MetLife's motion is granted.

*BACKGROUND*

Unless otherwise noted, the following facts are undisputed. On February 25, 1993, Robert L. Kolowski ("the decedent") died as a result of a heart attack. The decedent was enrolled in the Illinois State Employees Group Life Insurance Program (the "Program"), a group life insurance policy issued

---

1. Plaintiffs concede that Robert and Joshua Kolowski have no standing to pursue benefits under the MetLife policy. These two Plaintiffs are thereby dismissed by agreement of the parties.

by MetLife to decedent's employer, the State of Illinois. The Program provides life insurance and accidental death and dismemberment coverage to eligible employees upon proof of the following:

> If a member [i.e., an eligible employee] while insured for this benefit sustains any accidental bodily injury which, independent of all other causes, is the direct cause of any loss shown in the SCHEDULE OF LOSSES AND BENEFITS, and if such loss occurs within the three hundred sixty-five day period immediately following the date such injury was sustained, the [Metropolitan Life Insurance] Company will pay, subject to the provisions of this plan, the amount provided for such loss in accordance with the GENERAL PROVISIONS and the SCHEDULE OF LOSSES AND BENEFITS on the day such injury was sustained.

MetLife acknowledges that loss of life is an example of a type of loss covered by the Accidental Death and Disbursement provision of the Program. However, the Program also reads, in part, that "[n]o Accidental Death and Dismemberment benefit is provided for loss caused by or resulting from," among other things, "sickness or disease."

The decedent worked as an Illinois state trooper from 1973 until his death. He served as a patrol officer until 1986, when he moved to the division of criminal investigation of the Illinois State Police, and remained there until his death. The decedent also worked for the Will County Sheriff's office during the 1990's. On average, the decedent worked 10 to 12 hours per day as an Illinois state trooper, and worked more hours per day on average following his job change in 1986. As a special agent in the division of criminal investigation, the decedent was involved primarily with "drug busts," which consisted of arresting suspected drug dealers, confiscating illegal drugs, and various types of undercover work. The decedent's job required him to be on call 24 hours per day, and it was not unusual for the decedent to be called out to work all night until the next morning.

The decedent was first diagnosed with atrial fibrillation in the early 1970's. He received medical treatment including medication intended to help regulate his heartbeat. In response to symptoms of lightheadedness and shortness of breath, the decedent was hospitalized in 1980 and underwent a "cardioversion" procedure which was unsuccessful. The decedent's physician subsequently recommended cardiac catheterization, which the decedent elected not to undergo. In 1987, 1991, and 1992, the decedent experienced blackout episodes during which he would momentarily lose consciousness. The decedent again sought medical treatment, and was told that atrial fibrillation was a possible cause of his blackouts. However, no additional treatment occurred, and the exact cause of these episodes was never determined. The decedent did not seek treatment for atrial fibrillation from February of 1992 until his death.

The decedent also experienced emotional stress related to his job. In 1980, the decedent and a fellow officer were involved in a deadly shoot-out with a suspect. The suspect fell and later died after being shot 13 times. As a result of this harrowing experience, the decedent suffered severe nightmares from the time of the shoot-out to his death. Additionally, the decedent filed an internal complaint with the Will County Sheriff in 1993 regarding a police lieutenant's ethnic slurs directed at the decedent. The decedent confided with a colleague that as a result of the emotional stress he was experiencing, "the strain that [the decedent] was under was nearly unbearable."

On February 19, 1993, the decedent worked 18 hours, during which he was involved in a drug bust which netted 300 pounds of cannabis. The decedent was responsible for removing the drugs, and assisting in the arrest of the suspects involved. The decedent was solely responsible for transferring the 300 pounds of cannabis into an unheated storage garage in winter temperatures. When he returned home the following morning, the decedent felt ill, coughing, and complaining of congestion and flu-like symptoms. The decedent remained at home for the next two days as he continued to feel ill. He returned to work on Wednes-

day, February 24, 1993. The decedent died while sitting in the driver's seat of his patrol car on the next day, February 25, 1993, after he had gone into work to finish paperwork in connection with the drug bust of February 19[th.] A report of the coroner's physician to the coroner of Will County Illinois indicated that the immediate cause of the decedent's death was "myocardial infarction."

Following the death of her husband, Ms. Kolowski filed claims with the Illinois Commission under the Illinois Workers' Compensation Act, and the Illinois Court of Claims under the Law Enforcement Officers, Civil Defense Workers, Civil Air Patrol Members, Paramedics, Firemen, and State Employee's Compensation Act, and was awarded benefits under each. Initially, Ms. Kolowski received $250,000 in "basic life" and "optional life" insurance benefits as the decedent's beneficiary under the Program from Met Life. However, on January 7, 1997, MetLife, which reviews claims brought under the Program, denied Ms. Kolowski's supplemental claim for "accidental death" benefits—amounting to an additional $250,000. MetLife reasoned that because of the decedent's history of heart problems, his death was not the result of an accident, independent of all other causes. MetLife also denied the claim because the decedent's death was caused by "sickness or disease" of his heart, which is excluded under the accidental death provisions of the Program.

## DISCUSSION

### I. Standards for Summary Judgment

Summary Judgment is appropriate where the pleadings, answers to interrogatories, affidavits, and other materials show that there exists "no genuine issue as to any material fact" and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material facts" are those that might affect the outcome of the suit under governing law. *Id.* A "genuine issue" exists only if

there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* 477 U.S. at 249, 106 S.Ct. 2505. When considering a motion for summary judgment, a court must view the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the non-movant. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991). But, "if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance," summary judgment must be denied. *O'Connor v. Chicago Transit Auth.,* 985 F.2d 1362, 1366 (7th Cir.1993).

### II. Decedent's Heart Attack Was Not "Accidental"

■ Initially, this Court recognizes that Plaintiffs have the burden of proving that the decedent died as a result of an accidental bodily injury within the terms of the subject policy. *Wahls v. Aetna Life Ins. Co.,* 122 Ill.App.3d 309, 311, 77 Ill.Dec. 843, 461 N.E.2d 466, 469 (1983) (citations omitted).[4] The heart of MetLife's motion for summary judgment is that the decedent's death was non-accidental. MetLife contends that the decedent's 23–year history of atrial fibrillation in combination with the physical and emotional stress of his job caused the heart attack which resulted in his death. Plaintiffs respond that while the decedent unquestionably died of a heart attack, that heart attack was, at the very least, "contributed" to by his "unusual" working conditions just prior to the attack. A critical question for both parties is whether decedent's heart attack was "accidental."

The Program does not define the term "accidental." Consequently, MetLife's argument relies on recent Illinois case law defining an "accident" as "an unforseen occurrence, usually of an untoward or disastrous character, or an undesigned sudden or unexpected event of an inflictive or unfortunate character." *See Litman v. Monumental Life Ins. Co.,* 289 Ill.App.3d 181, 183, 224 Ill.Dec. 574, 682 N.E.2d 135, 137 (1997). Based on this definition, MetLife reasons that the decedent's death by heart attack was foresee-

---

4. Both parties agree that in this diversity case, Illinois law supplies the rule of decision.

able when considered within the context of his long history of atrial fibrillation and the lack of any alternative "unforeseen occurrence" of an "untoward or disastrous character."

Plaintiffs respond that despite the decedent's history of atrial fibrillation, he did not act in a manner that would have made his death "foreseeable." The parties have gone off on a bit of a tangent with respect to their ongoing debate about the "foreseeability" of the decedent's death. "Death is almost always accidental in the sense of unintended by the deceased, so if an accidental result sufficed, coverage would be assured regardless of the cause of death." *Senkier v. Hartford Life & Accident Ins. Co.*, 948 F.2d 1050, 1052 (7th Cir.1991). Clearly, the sudden heart attack suffered by decedent was neither expected nor foreseen by him. Thus, any useful definition of "accidental" must be narrowed to comport with the common understanding of the term—particularly since it is "common" people who purchase insurance policies. *See id.* at 1053.

■ Unfortunately, this is not the first time that this Court has been asked to define "accident" or "accidental" in the context of an insured who suffers a fatal heart attack. In *Haley v. American Intern. Life Assurance Co.*, 789 F.Supp. 260 (N.D.Ill.1992), this Court considered the case of a 53–year–old man who returned home from work early and suffered an "unexpected" heart attack. After surveying Illinois law,[5] this Court found that:

[a]s a general rule, in the absence of any unexpected or unforeseen trauma, external

force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident.

*Haley v. American Intern. Life Assurance Co.*, 789 F.Supp. 260, 263 (N.D.Ill.1992) (citing *Riesterer v. Crown Life Ins. Co.*, 653 F.2d 268, 269 (6th Cir.1981); *Benante v. Allstate Ins. Co.*, 477 F.2d 553, 554 (5th Cir.1973)); *see accord Howard v. National Educ. Assoc. of New York*, 984 F.Supp. 103, 108 (N.D.N.Y.1997). Thus, a fatal heart attack, absent an unexpected or unforeseen triggering event, cannot be considered an accidental injury.

■ The next logical question is whether the decedent's heart attack was triggered by an unexpected or unforeseen trauma. Plaintiffs claim that the drug bust the decedent participated in six days before his heart attack was just such an event. Specifically, Plaintiffs point out that between February 19 and February 20, 1993, the decedent worked an 18 hour day and transferred 300 pounds of cannabis[6] by himself into an unheated storage garage in Chicago winter conditions.[7] Plaintiffs contend that the physical exertion required of the decedent on February 19 was a departure from his typical work routine and should be considered as an unexpected or unforeseen triggering event of his heart attack.[8]

In support of their argument, Plaintiffs cite to *Mers v. Marriott International Group Accidental Death*, 949 F.Supp. 1323 (N.D.Ill. 1996), *aff'd*, 137 F.3d 510 (7th Cir.1998), where this Court found that an insured's

---

**5.** *Haley* was an action under ERISA, and as such, the plan at issue was interpreted under principles of "federal substantive law"—which looks to state law for "guidance." 789 F.Supp. at 262.

**6.** The cannabis was stored in an unknown number of small packages that were hidden in the bench seat of a truck.

**7.** Plaintiffs claim that it was "extremely cold" outside and MetLife claims that there is no evidence establishing weather conditions. This Court feels comfortable taking judicial notice of the fact that it is normally very, if not extremely, cold in Chicago during February.

**8.** MetLife maintains that there was no "triggering event" leading to the decedent's heart attack given his long-standing medical condition and the fact that he did not experience his heart attack until six days after his February 19 workday. There is conflicting medical testimony on this issue. Plaintiffs' expert, Dr. James Talano, opines that the "physical and psychological stress" associated with decedent's police activities "contributed" to his heart attack. (MetLife 12(M) at ¶ 75.) However, MetLife's expert, Dr. William Buckingham, opines that the decedent's work activities were "totally unrelated" to his death. (*Id.* at ¶ 76.) In light of the standards for summary judgment, the Court will assume that the decedent's work activities "contributed" to his heart attack.

heart attack was accidental and was triggered by his unusual working conditions. In *Mers,* the insured was a 44–year–old account executive with Marriot. *Id.* 949 F.Supp. at 1325. Mers was attending a five-day management conference in Chicago. As part of the conference, Mers participated in a Habitat for Humanity project requiring him to wield a sledge hammer and crow-bar to tear down a plaster and lath wall. *Id.* While engaged in this "strenuous activity," Mers collapsed and suffered a cardiac arrest due to a cerebral hemorrhage. *Id.* This Court determined that Mer's·heart attack was accidental "as it was triggered by unusual physical activity and it was not, and indeed could not, reasonably have been foreseen or expected." *Id.* 949 F.Supp. at 1331.

While the *Mers* case bears certain superficial similarities to the instant case, this Court believes that the circumstances are significantly different. *Mers* involved an individual who, for all intents and purposes, was a sedentary account executive whose typical workday did not involve wielding a sledgehammer and demolishing a building. In contrast, the decedent was a special agent in the division of criminal investigation—primarily responsible for drug busts—which involved arresting suspected drug dealers, confiscating the seized illegal drugs, and related undercover work. (MetLife 12(M) at ¶ 29.) [9] The decedent worked six days per week, 10–12 hours per day in all types of Chicago weather conditions. (*Id.* at ¶¶ 25, 27, 30.) During some weeks, the decedent worked more than 12 hours per day and seven days a week. (*Id.*) The decedent was ·normally on 24–hour call and in one instance was involved the confiscation and movement of 800 pounds of cannabis during a separate drug bust that took place approximately one month before his death. (*Id.* at ¶ 78.) All in all, the decedent considered his job to be "stressful" and a source of "frustration." (*Id.* at ¶ 31.) A major source of the decedent's stress can be traced back to an incident in 1980 when the decedent was involved in a "shoot-out" with a suspect in which he [the decedent] was shot at and the suspect was ultimately killed. (*Id.* at ¶¶ 32–35.)

In short, nothing about the evening of February 19, 1993 appears to have been unexpected or unforeseen given the everyday rigors and responsibilities of the decedent's job. In the decedent's line of work, he could reasonably have expected to participate in "high risk arrests," physically restrain armed suspects, move 800 pounds of drugs, or be shot at. (*Id.* at ¶ 78.) Of these admittedly disturbing options, the decedent's work activities on the night of February 19, 1993 seem almost mundane. If, as Plaintiffs maintain, the decedent was in great shape, exercised a "good deal" and lifted weights, this Court can find nothing in the decedent's activities on February 19, 1993 that would be out of the ordinary or unusual given his job description. While the decedent's apparent "good health" understandably calls into question what might have caused his heart attack, there is insufficient evidence to assume that it was related to anything unexpected or unforeseen at his job.

### III. *Sickness or Disease Exclusion*

MetLife argues that there is an additional rationale for denying Plaintiffs' claim. Namely, the Program provides in part that "[n]o Accidental Death and Dismemberment benefit is provided for loss caused by or resulting from," among other things, "sickness or disease." The exclusion raises two questions: (1) did the decedent suffer from a "sickness or disease"; and (2) did this alleged "sickness or disease" cause the decedent's death.

As for the first question, there is some dispute as to whether the decedent's heart condition was in fact a "disease." Plaintiffs do not really claim that the decedent's heart condition was not a disease, they simply argue that MetLife has failed to meet its burden of establishing that it *was* a disease. Again, the Program does not define "sickness or disease," so this Court is left to consider the ordinary meaning of the words in light of the evidence before it. The Court is not particularly impressed with MetLife's reliance on various dictionary definitions of "sickness" and "disease." Still, Dr. Bucking-

---

**9.** Plaintiffs have not disputed any of the facts set forth in MetLife's 12(M) Statement.

ham's opinion that the decedent suffered from "cardiac disease" is significantly more persuasive. (*See* MetLife 12(M) at ¶ 77.) In fact, given Plaintiffs' failure to provide this Court with any evidence to the contrary, the Court agrees with MetLife that the decedent suffered from a "disease" as provided for in the Program's exclusion.

 This Court's discussion from the previous section all but compels the conclusion that the decedent's death was "caused" by his disease. In other words, given the fact that the decedent's heart attack was not "accidental"—i.e., caused by an unforeseen occurrence—there is very little else that could be the "cause" of his death. While this Court is aware of Illinois case law holding that there may be more than one proximate cause of an injury even where the insured was predisposed to the injury due to a preexisting illness, *see Faulkner v. Allstate Life Ins. Co.*, 291 Ill.App.3d 706, 711–12, 225 Ill. Dec. 680, 684 N.E.2d 155, 158–59 (1997), Plaintiffs have presented no alternative proximate cause aside from the decedent's everyday life. The mere fact that the decedent was employed in a stressful line of work—while potentially "contributing" to his disease—does not suffice to establish an additional proximate cause of his death. This is particularly true when the Court considers the testimony of MetLife's expert, Dr. Buckingham, who has opined that "the progression of the [cardiac] disease for a record of 23 years (1970–1993), is clearly the cause of the [decedent's] illness and ultimate death." (MetLife 12(M) at ¶ 77.) Many individuals have stressful jobs that "take years off their lives." Nevertheless, considering this variable in the proximate cause analysis of an insured's death—where there is no evidence of an unforeseen occurrence—would be misguided and without precedent.

### CONCLUSION

For the foregoing reasons, the Court grants MetLife's motion for summary judgment.