SECOND DIVISION

JUNE 21, 2005

No. 1-03-1852

ANDREW CARNEY, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 98 CH 03345

)

THE PAUL REVERE LIFE ) 

INSURANCE COMPANY, ) The Honorable

) Thomas P. Quinn,

Defendant-Appellant. ) Judge Presiding.

JUSTICE GARCIA delivered the opinion of the court.

The defendant insurer, The Paul Revere Life Insurance Company (Paul Revere), paid benefits to the plaintiff, Andrew L. Carney, M.D., under a disability insurance policy, after Dr. Carney filed a claim stating that he was disabled by "sickness."  The policy provided a maximum benefit period until age 65 for a total disability due to "sickness," and a lifetime benefit for a total disability due to "injury."  Shortly before the policy's "sickness" benefits were to expire, Dr. Carney sought to recharacterize his disability as an "injury."  Paul Revere refused the reclassification, and in March 1998, Dr. Carney filed a complaint against Paul Revere alleging that Paul Revere refused to act in accordance with the policy. 

Subsequently, the parties filed cross-motions for summary judgment seeking judgment as a matter of law regarding whether Dr. Carney's disability was the result of a "sickness" or an "injury."  In June 2003, the circuit court classified Dr. Carney's disability as the result of an "injury" and granted summary judgment in favor of Dr. Carney.  Paul Revere appeals, arguing Dr. Carney's disability was a "sickness," rather than an "injury," and its obligation to pay under the terms of the policy expired upon Dr. Carney's sixty-fifth birthday.    

BACKGROUND

On February 5, 1981, Dr. Carney, a cardiovascular and neurovascular surgeon, purchased a disability insurance policy from Paul Revere.  The policy provides a maximum benefit period to age 65 for a total disability due to "sickness," and a lifetime benefit for a total disability due to "injury."  Under the "definitions" section of the policy, several terms are defined, including, 
inter
 
alia
:

"'Injury' means accidental bodily injury sustained while this policy is in force.

'Sickness' means sickness or disease which first manifests itself while this policy is in force.

'Total Disability' means that as a result of such injury or sickness the Insured is unable to perform the duties of his regular occupation and is not engaged in any other gainful occupation."

The policy did not define "accidental bodily injury."  The "benefit provisions" portion of the policy provided for either total disability by "Accident" [Provision A] or by "Sickness" [Provision B].  The language in each provision was identical except for the use of "injury" or "sickness," and Provision B stated that "sickness" must occur "while the policy is in force":  

"If such injury [sickness] results in continuous total disability [while this policy is in force] and requires the regular and personal attendance of a licensed physician, the Company will pay periodically the Monthly Indemnity for Total Disability from Accident [Sickness] at the rate set forth in the Policy Schedule, beginning with the standard commencement date for accident [sickness] and during the continuance of such total disability for a period not exceeding the Maximum Benefit Period for *** Total Disability from Accident [Sickness] specified in the Policy Schedule ***.

The Policy Schedule contains a table of benefits:

TOTAL DISABILITY

COMMENCEMENT DATE

RATE OF MONTHLY INDEMNITY

MAXIMUM BENEFIT PERIOD 

FROM ACCIDENT

91st DAY OF DISABILITY

$3,500.00

LIFETIME

FROM SICKNESS

91st DAY OF DISABILITY

$3,500.00

TO AGE 65

On August 18, 1986, Paul Revere received a disability proof of claim form signed by Dr. Carney and his attending physician, Dr. John Dwyer.  The form claimed total disability due to "sickness" that began on March 22, 1986, the last day Dr. Carney performed surgery.  The details of the "sickness" were described as, "[p]ain in both forearms as well as paresthesias of the ulnar distribution of both hands - progressive now cannot sustain grip when operating."  Dr. Carney was subsequently diagnosed as suffering from pronator teres syndrome.
(footnote: 1)  

In his deposition, Dr. Carney testified that on November 25, 1985, he had "an acute onset of pain and numbness that extended from [his] elbow, the medial aspect of [his] elbow, to [his] hand."  Dr. Carney also testified that besides numbness, he had a great deal of pain.  Dr. Carney testified that he sought medical care because "[t]here was a mass on the medial aspect of my arm, that distribution, the distribution of the median nerve."  Dr. Carney testified that pronator teres syndrome is the compression of the median nerve at the elbow.  Dr. Carney testified that prior to his diagnosis he had experienced symptoms of pronator teres syndrome, specifically, he had difficulty with alternating mechanical motions.  Dr. Carney testified that he tried but failed to tighten a shackle with a wrench, he experienced edema and muscular tremors, and he had spasms throughout his right hand and into his fingers.  Dr. Carney testified that he did not attach any significance to these problems until he began reading about pronator teres syndrome.  Dr. Carney performed surgery until the latter part of March 1986.

Dr. Carney's treating physician, Dr. Dwyer, was also deposed and testified he first saw Dr. Carney in May 1986.  Dr. Dwyer testified that he was an orthopedic surgeon and that Dr. Carney had asked him for a consultation, as he was having difficulty with his upper extremities.  Dr. Dwyer testified that he diagnosed Dr. Carney as having 

"compression neuropathy about the elbow primarily on the side with some evidence on the right side, and it was such that the nerves to the - extending through the elbow were compressed.  And there was neuropathy which manifests itself with pain, weakness, numbness, loss of strength and loss of endurance."  

Dr. Dwyer testified that as a cardiovascular surgeon, Dr. Carney would be required to use both hands, have dexterity, control of his movements, modulated strength, endurance, and the ability to feel what his other hand was doing.  Dr. Dwyer testified that in August 1986, he came to the conclusion that Dr. Carney could not continue his occupational duties.  Dr. Dwyer testified that he saw Dr. Carney as a patient for more than 10 years, and at no time was he able to return to work as a surgeon.  

Dr. Dwyer testified that Dr. Carney's condition could not be linked to any "single or sentinel" trauma.  Instead, repetitive trauma brought Dr. Carney's symptoms to a head.  Dr. Carney's attorney then asked a question to Dr. Dwyer regarding repetitive trauma:

"[Dr. Carney's Attorney]: With respect to the repetitive trauma, is that something that was caused by some kind of sickness or illness in Dr. Carney?

[Dr. Dwyer]: No, not that I was aware of.  He has no constitutional or systemic disease that would explain the symptomatology and findings.

[Dr. Carney's Attorney]: There was no bacterial or viral infection that caused it?

[Dr. Dwyer]: Nor any diabetic or circulatory disruption, no, there was none.

[Dr. Carney's Attorney]: So the sole cause of the repetitive trauma would have just been the actual use or overuse of his arm or hand?

[Paul Revere's Attorney]: Objection, foundation, speculation.

[Dr. Dwyer]: Yes, use and overuse in that holding an instrument or a piece of human tissue for a prolonged period of time does require constant muscle contraction, control, and can cause both circulatory and neurological problems."

Dr. Dwyer opined that Dr. Carney's condition was permanent and that he recommended surgical intervention.  Dr. Dwyer testified that Dr. Carney did not elect to have surgery due to the risks involved.  Dr. Dwyer's notes indicated he saw Dr. Carney until 1996, but there were no specific notes regarding what occurred at each of those visits.           

Pursuant to Dr. Carney's claim, in October 1986, Paul Revere began paying total disability benefits under the "sickness" provision of the policy.  From October 1986 until June 1994, Dr. Carney submitted monthly medical progress reports to Paul Revere in which his disability was classified as a "sickness."

On July 26, 1994, Dr. Carney attempted to reclassify his disability as an "injury." 

Paul Revere continued to pay Dr. Carney total disability benefits through January 17, 1997, the day prior to Dr. Carney's sixty-fifth birthday and the maximum benefit period under the policy for total disability due to "sickness."  Paul Revere paid Dr. Carney a total of $550,000 in disability under the "sickness" provision of the policy.

In March 1998, Dr. Carney instituted the instant action.  In September 1999, Dr. Carney filed a second-amended complaint alleging that he "developed an accidental total disability in both forearms" and that Paul Revere had failed to continue payment in accordance with the policy.  Following discovery, the parties presented cross-motions for summary judgement.  The respective motions focused on whether Dr. Carney's disability was the result of a "sickness" or an "injury."  Both motions sought judgment as a matter of law classifying Dr. Carney's pronator teres syndrome as either one or the other.  The trial court granted Dr. Carney's summary judgment motion, finding that his disability was the result of an "accidental bodily injury."  This appeal followed. 

ANALYSIS

Paul Revere asserts three arguments for our review: (1) that the circuit court erred in classifying Dr. Carney's disability as an "accidental bodily injury," (2) that Dr. Carney recognized his disability was a sickness as supported by his indication on the first forms submitted in seeking the recovery of policy benefits, and (3) the circuit court erroneously applied workers' compensation law in determining Dr. Carney's disability was an "accidental bodily injury."

Classification of Dr. Carney's Disability

The question presented is whether pronator teres syndrome, from which Dr. Carney suffers, was caused by "sickness," in which case Dr. Carney has received the policy's full benefit, or alternatively, whether it was caused by an "accidental bodily injury," in which case Dr. Carney is entitled to receive a lifetime benefit pursuant to the policy schedule.  See 
Strehlow v. Aetna Life Insurance Co.
, 183 Ill. App. 50, 52 (1913).  Whether to classify Dr. Carney's disability as an "injury" or as a "sickness" is determined by the parties' insurance contract.  "When construing the language of an insurance policy, a court's primary objective is to ascertain and give effect to the intentions of the parties as expressed by the words of the policy."  
Central Illinois Light Co. v. Home Insurance Co.
, 213 Ill. 2d 141, 153, 821 N.E.2d 206 (2004), citing 
Crum & Forster Managers Corp. v. Resolution Trust Corp.
, 156 Ill. 2d 384, 391, 620 N.E.2d 1073 (1993).   

We begin by noting our standard of review.  The circuit court's entry of summary judgment is subject to 
de
 
novo
 review.  
Central Illinois Light Co.
, 213 Ill. 2d at 153.  The construction of an insurance policy is also reviewed 
de
 
novo
, as it is a question of law.  
American States Insurance Co. v. Koloms
, 177 Ill. 2d 473, 479-80, 687 N.E.2d 72 (1997).  An insurance contract is to be construed as a whole, giving effect to every provision because it must be assumed that every provision was intended to serve a purpose.  
Central Illinois Light Co.
, 213 Ill. 2d at 153.  If the words used are clear and unambiguous, they must be given their plain and ordinary meaning; however, if the words used are reasonably susceptible to more than one meaning, the words are considered ambiguous and will be strictly construed against the drafter.  
Central Illinois Light Co.
, 213 Ill. 2d at 153, citing 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 108-09, 607 N.E.2d 1204 (1992).  Further, "an ambiguity will be found if the language of the contract is 'obscure in meaning through indefiniteness of expression.'"  
Central Illinois Light Co.
, 213 Ill. 2d at 153, quoting 
Platt v. Gateway International Motorsports Corp.
, 351 Ill. App. 3d 326, 330, 813 N.E.2d 279 (2004).  Whether a contract is ambiguous is a question of law which we review 
de
 
novo
.  
Central Illinois Light Co.
, 213 Ill. 2d at 154.

Paul Revere first argues that the circuit court erred in classifying Dr. Carney's pronator teres syndrome as an "injury."  Paul Revere argues, "Dr. Carney did not sustain any discrete trauma that resulted in his neuropathy, nor did an unusual event or cataclysmic occurrence trigger Dr. Carney's condition.  To the contrary, Dr. Carney's neuropathy 
developed
 and 
progressed
 over Dr. Carney's lifetime as a result of his normal everyday activities."  (Emphasis in original.)   

Dr. Carney maintains that his treating physician, Dr. Dwyer, testified that pronator teres syndrome was caused by repeated trauma, in effect, a series of injuries.  Dr. Dwyer also testified that Dr. Carney had no systemic disease, bacterial or viral infection, or diabetic or circulatory problems that would explain his injury.  Dr. Carney argues that as Dr. Dwyer's testimony was unrebutted, it must be found that Dr. Carney's disability was the result of an "injury."

Keeping the principles of insurance contract construction in mind, we begin by noting that "injury" is defined in the policy as "accidental bodily injury."  "Sickness" is defined as "sickness or disease."  Both parties' briefs to this court are filled with definitions from other sources for the terms "accident," "accidental," "sickness," "disease," and "bodily injury."  Dr. Carney maintains that "the term 'accidental bodily injury' as used in the policy is ambiguous as a matter of Illinois law."  We note that a contract is not rendered ambiguous merely because the parties disagree on the meaning of its terms; however, a contract is not necessarily unambiguous when each party insists that the language unambiguously supports its position.  
Central Illinois Light Co.
, 213 Ill. 2d at 153-54.

1. Sickness vs. Injury

Paul Revere maintains that, "[m]any individuals, like Dr. Carney, develop sickness and disease as a result of routine daily activities, simply because the body's physiology naturally deteriorates over time from the stress and strain of normal living."  Paul Revere offers as an example the development of a dermal melanoma due to normal exposure to the sun's ultraviolet rays.  Paul Revere further posits that Dr. Carney's pronator teres syndrome followed "the pathology of a sickness" in that his condition developed over time and as a result of his own body's weakness and the everyday environment in which he worked.  Paul Revere maintains that sickness and disease develop and progress, accidents do not.  Accordingly, Paul Revere's brief states, "[a]n insured, therefore, who goes about the normal everyday activities of life in the usual and ordinary way, and as a result thereof, develops a condition of ill health, is considered under Illinois law to have developed a [s]ickness rather than sustained an [a]ccidental [b]odily [i]njury."     

Dr. Carney contends that his expert, Dr. Dwyer, was specifically asked whether Dr. Carney's disability was the result of a sickness or disease, and he answered in the negative.  Dr. Dwyer attributed Dr. Carney's disability to repetitive trauma and the use or overuse of his hands, specifically, holding surgical instruments.  We take note, as previously observed, that Dr. Dwyer's testimony stood unrebutted; Paul Revere failed to present any evidence to challenge Dr. Dwyer's expert opinion that Dr. Carney's disability was not caused by sickness or disease.  See 
Kolowski v. Metropolitan Life Insurance Co.
, 35 F. Supp. 2d 1059, 1064 (N.D. Ill. 1998) (where the court found that decedent suffered from "cardiac disease" as testified to by insurance company's expert where the plaintiff failed to provide the court "with any evidence to the contrary.")

Both parties cite to 
Zurich Insurance Co. v. Raymark Industries, Inc.
, 118 Ill. 2d 23, 514 N.E.2d 150 (1987), in support of their case.  In that case, our supreme court examined the duty of insurance companies to defend their client, a manufacturer of asbestos, from claims involving personal injury and wrongful death from exposure to asbestos.  The parties' insurance contract stated, "'[t]he company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of Coverage A. bodily injury.'"  
Zurich
, 118 Ill. 2d at 33.  The policy in 
Zurich
 defined "bodily injury" as "'bodily injury, sickness or disease.'"  
Zurich
, 118 Ill. 2d at 33.  These terms were found to be unambiguous.  
Zurich
, 118 Ill. 2d at 47.

In order to determine whether the insurance company had an obligation to defend, our supreme court first determined whether the inhalation of asbestos qualified as a "bodily injury."  Our supreme court found that the record supported the circuit court's determination that a "'bodily injury' occurs when asbestos fibers are inhaled and retained in the lung."  
Zurich
, 118 Ill. 2d at 45.  Our supreme court noted, too, the circuit court's definition of "'sickness'" as "'ill health, a disordered, weakened or unsound condition'" (
Zurich,
 118 Ill. 2d at 46), and that "the plain meaning of the term 'disease' is 'a condition of the living animal *** or one of its parts that impairs the performance of a vital function'" (
Zurich
, 118 Ill. 2d at 45).  Our supreme court further explained, "under the plain and unambiguous language of the policies at issue, the insurer must provide coverage of asbestos-related claims if the claimant in the underlying action suffered 'bodily injury,' 'sickness' or 'disease' during the policy period."  
Zurich
, 118 Ill. 2d at 47. 

We find 
Zurich
 instructive.  As in 
Zurich
, where each inhalation of asbestos was found to constitute a "bodily injury," here, we find that each repetitive trauma experienced by Dr. Carney was a "bodily injury."  See 
Provident Life & Accident Insurance Co. v. Hallum
, 276 Ga. 147, 576 S.E.2d 849 (2003) (where an identical provision was found to support a finding of bodily injury, "a person who unexpectedly suffers from carpel tunnel syndrome brought on by years of intentional repetitive hand motions that render him disabled has suffered an 'injury,' as that term is defined in *** [the] insurance policy.").  As Dr. Dwyer's testimony explained, each time Dr. Carney operated, he used his wrists in such a way that a repetitive trauma occurred.  As a result, he developed and was diagnosed as suffering from pronator teres syndrome.  Dr. Carney's disability and inability to move his wrists as required for his job were not caused by sickness, "'ill health, a disordered, weakened or unsound condition'" (
Zurich
, 118 Ill. 2d at 46), or "'disease,'" "'a condition of the living animal *** or one of its parts that impairs the performance of a vital function'" (
Zurich
, 118 Ill. 2d at 45).  Dr. Dwyer specifically testified that Dr. Carney's pronator teres syndrome resulted from repetitive trauma and that "there was no constitutional or systemic disease that would explain the symptomatology and findings."  

Accordingly, we determine that Dr. Carney's disability was the result of repetitive trauma, each of which may be classified as an "injury."  We must now determine whether this "injury" constitutes an "accidental bodily injury" as set out in the parties' disability insurance policy.

2. Accidental Bodily Injury

Our research has uncovered no Illinois cases construing the phrase "accidental bodily injury" in the context of a disability insurance policy.  However, a case determining an insurance company's duty to defend found "[t]he concept of accidental bodily injury presupposes that the injury naturally and probably followed from the acts of the insured."  
Illinois Farmers Insurance Co. v. Preston
, 153 Ill. App. 3d 644, 648, 505 N.E.2d 1343 (1987).  Generally, in determining whether an event qualifies as an accident, Illinois adheres to the rule of law promulgated by the United States Supreme Court in 
United States Mutual Accident Ass'n v. Barry
, 131 U.S. 100, 33 L. Ed. 60, 9 S. Ct. 755 (1889).  See 
Lyons v. State Farm Fire & Casualty Co.
, 349 Ill. App. 3d 404, 811 N.E.2d 718 (2004).  

In 
Barry
, three physicians jumped to the ground from a platform that was several feet high.  Two of the men landed safely; however, Dr. Barry landed awkwardly, immediately became ill, and died a few days later from a twisted duodenum
(footnote: 2) caused by the landing.  Dr. Barry's insurer claimed that the death was not accidental within the meaning of the policy.  The Supreme Court in 
Barry
 reasoned that while Dr. Barry intended to jump, he believed he would, and intended to, land safely, and the fact that he did not land as expected constituted the accident.  
Barry
, 131 U.S. at 121, 33 L. Ed at 60, 9 S. Ct. at 762; 
Lyons
, 349 Ill. App. 3d at 409.  

Later, in 
Yates v. Bankers Life & Casualty Co.
, 415 Ill. 16, 19, 111 N.E.2d 516 (1953), our supreme court commented that "if an act is performed with the intention of accomplishing a certain result, and if, in the attempt to accomplish that result, another result, unintended and unexpected, and not the rational and probable consequence of the intended act, in fact, occurs, such unintended result is deemed to be caused by accidental means."  

In 
Lyons
, a homeowner filed a complaint for declaratory judgment, seeking a determination that his insurance company had a duty to defend him under his homeowner's policy against a neighbor's lawsuit.  
Lyons
, 349 Ill. App. 3d at 405.  The homeowner's policy at issue in 
Lyons
 provided coverage for "'damages because of bodily injury or property damage to which this coverage applies, caused by an occurrence.'"  
Lyons
, 349 Ill. App. 3d at 407.  The homeowner's policy defined "occurrence" as "'an accident, including exposure to conditions, which result in: a. bodily injury; or b. property damage.'"  
Lyons
, 349 Ill. App. 3d at 407.  The 
Lyons
 court stated that "[t]he focus of the inquiry in determining whether an occurrence is an accident is whether the injury is expected or intended by the insured, not whether the acts were performed intentionally."  (Emphasis omitted.)  
Lyons
, 349 Ill. App. 3d at 409.  

In 
Lyons
, the homeowner had built levees that intruded upon his neighbor's property.  Although the homeowner had intentionally built the levees, "[t]he question determining policy coverage is whether he intended to build part of the levees over the property line onto the [neighbor's] property."  
Lyons
, 349 Ill. App. 3d at 409.  As there was no evidence or even an allegation suggesting that the homeowner had intentionally built the levees so as to extend onto his neighbor's property, the insurance company had a duty to defend.  
Lyons
, 349 Ill. App. 3d at 410-12.             

In some states, the law distinguishes between insurance coverage for accidental injuries and coverage for injuries caused by accidental means.  See 
Provident Life & Accident Insurance Co v. Hallum
, 276 Ga. 147, 576 S.E.2d 849 (2003); 
Collins v. Nationwide Life Insurance Co.
, 409 Mich. 271, 294 N.W.2d 194 (1980).  "An accidental injury is an injury that is unexpected but may arise from a conscious voluntary act.  In contrast, an injury from accidental means is one that is the unexpected result of an unforseen or unexpected act that was involuntary or unintentionally done."  
Hallum
, 276 Ga. at 147-48.  Although Illinois does not distinguish between accidental means and accidental results (
Marsh v. Metropolitan Life Insurance Co.
, 70 Ill. App. 3d 790, 793, 388 N.E.2d 1121 (1979)), Georgia and Michigan do.  The scenario present in the case 
sub
 
judice
 has been handled in both those states with differing results.  

In 
Hallum
, a gynecologist suffered from carpal tunnel syndrome and was unable to continue practicing.  
Hallum
, 276 Ga. 147.  Dr. Hallum had a disability insurance policy with a schedule similar to the one in this case: if Hallum's disability was due to an injury, he received lifetime benefits; however, if the disability was due to sickness then benefits ceased at age 65.  
Hallum
, 276 Ga. at 147.  "The policy defines injuries to mean 'accidental bodily injuries occurring while your policy is in force.'  Sickness is defined as 'sickness or disease which is first manifested while your policy is in force.'"  
Hallum
, 276 Ga. at 147.  Dr. Hallum had no disease associated with carpal tunnel syndrome; "the record shows that his condition was caused by thirty years of performing the hand motions required by his obstetrics/gynecological practice."  
Hallum
, 276 Ga. at 147.  The supreme court of Georgia held:

"The insurance contract here uses the words 'accidental bodily injuries,' which, in the context of this policy, means a bodily injury that was unexpected, but could have arisen from a conscious or voluntary act.  By using 'accidental' to modify 'bodily injuries,' as opposed to modifying the cause or means of any injuries, the Provident Life policy places the focus of the coverage on the injuries, not the means that caused the injury.  Accordingly, an unexpected physical injury that disables the insured is covered as an 'injury' under this policy."  
Hallum
, 276 Ga. at 148.

Regarding the insurance company's argument that Dr. Hallum's bodily injury had to be traceable to a discreet event, the Georgia Supreme Court found that argument was unsupported by the parties' contract and by Georgia law.  
Hallum
, 276 Ga. at 148.

Two Michigan cases have also been decided with similar facts: 
Nehra v. Provident Life & Accident Insurance Co.
, 454 Mich. 110, 559 N.W.2d 48 (1997), and 
Pearson v. Provident Life & Accident Insurance Co.
, No. 204889, Michigan Court of Appeals (Mich. App. January 22, 1999)
.  

In 
Nehra
, a dentist developed carpal tunnel syndrome as a result of his work and claimed disability benefits under a disability insurance policy that had the same schedule of benefits as the policy schedule in the case before us and similarly hinged those benefits on whether the disability was defined as an injury or a sickness.  
Nehra
, 454 Mich. at 111-116.  The policy in 
Nehra
 defined "injury" and "sickness" as they are defined in the case 
sub
 
judice
.  
Nehra
, 454 Mich. at 112.  A critical factor in 
Nehra
, however, was that under Michigan no-fault insurance, "no-fault benefits 'are not recoverable where the plaintiff's condition results from a series of events.'"  
Nehra
, 454 Mich. at 114, n.6, quoting 
Mollitor v. Associated Truck Lines
, 140 Mich. App. 431, 437, 364 N.W.2d 344 (1985).  Thus, the 
Nehra
 court held that the dentist was not entitled to the lifetime benefits for an "injury" because (1) he suffered no discreet injury as "carpal tunnel syndrome is the product of prolonged repetition of hand movements" (
Nehra
, 454 Mich. at 117), and, as an aside, (2) he "recognized the true nature of his disability when he initially identified it as a 'sickness' not an 'accidental bodily injury'" (
Nehra
, 454 Mich. at 118).    

In 
Pearson
, a medical doctor experienced pain in his left shoulder, was treated using nonsurgical measures, and continued working.  Several years later, Dr. Pearson lifted a gas can and felt his shoulder pop.  Following arthroscopic surgery, Dr. Pearson was unable to return to work.  Dr. Pearson had a disability insurance policy that provided for lifetime benefits if a total disability was the result of injury, but benefits to age 65 if total disability was due to sickness.  The 
Pearson
 policy defined "injury" as "'accidental bodily injuries occurring while your [policy] is in force,'" and "sickness" as "'sickness or disease which is first manifested while your policy is in force.'"  
Pearson
, slip op at ___.  The 
Pearson
 court stated:  

"[W]here the language of a policy requires only an accidental injury, it would be incongruous to enable an insurance company to refuse payment simply because a plaintiff's injuries were caused by a plaintiff's voluntary act.  *** [W]e conclude that the distinction between accidental and non-accidental injuries lies between injuries that are caused by a discrete event and that are not intended or expected - whether they are the result of a voluntary triggering action or not - and injuries that either (1) are intended or expected or (2) are the result of a relatively gradual and prolonged process."   
Pearson
 slip op. at ___.  

The 
Pearson
 court noted that Dr. Pearson's inability to work was directly related to his injury from picking up the gas can.  The 
Pearson
 court distinguished 
Nehra
 by emphasizing that "the plaintiff in 
Nehra
 was unable to show that his injury was caused by a single, discrete event."  
Pearson
, slip op. at ___.

Hallum
, 
Nehra
, and 
Pearson
 agree that the voluntariness of an action is not determinative as to whether the resulting injury may be classified as an "accidental bodily injury."  Illinois courts have taken a similar stance when deciding what constitutes "accidental" for purposes of accidental death policies.  Paul Revere argues that "[a]ccidental death and dismemberment policies provide an instructive parallel" to the case 
sub
 
judice
.  We agree.  

Paul Revere cites to 
Kolowski
 for the proposition that "an impairment which develops as a consequence of normal activity is a 'sickness' - not an 'accidental injury' - even though the impairment was neither foreseeable nor expected."  In 
Kolowski
, a decedent's life was protected by a life insurance policy that provided death benefits but stipulated, "'[n]o Accidental Death and Dismemberment benefit is provided for loss caused by or resulting from,' among other things, 'sickness or disease.'"  
Kolowski
, 35 F. Supp. 2d at 1060.  The decedent suffered from a heart condition and died of a heart attack while at work.  
Kolowski
, 35 F. Supp. 2d at 1059.  

The 
Kolowski
 court first determined that the decedent's heart attack was not accidental.  The 
Kolowski
 court noted that the decedent's policy did not define "accidental," but did define "accident" as "an unforseen occurrence, usually of an untoward or disastrous character, or an undesigned sudden or unexpected event of an inflictive or unfortunate character."  
Kolowski
, 35 F. Supp. 2d at 1061.  The 
Kolowski
 court reasoned, "'[d]eath is almost always accidental in the sense of unintended by the deceased, so if an accidental result sufficed, coverage would be assured regardless of the cause of death'" (Kolowski, 35 F. Supp. 2d at 1062, quoting 
Senkier v. Hartford Life & Accident Insurance Co.
, 948 F.2d 1050, 1052 (7th
 Cir. 1991)).  Thus, a "fatal heart attack, absent an unexpected or unforeseen triggering event, cannot be considered an accidental injury."  
Kolowski
, 35 F. Supp. 2d at 1062.  "As a general rule, in the absence of any unexpected or unforseen trauma, external force or event which causes or triggers a heart attack, it is presumed that the death is a death by natural causes, not by an accident."  
Kolowski
, 35 F. Supp. 2d at 1062. 

The 
Kolowski
 court examined whether the decedent's heart attack was triggered by an unexpected or unforseen trauma.  
Kolowski
, 35 F. Supp. 2d at 1062.  The 
Kolowski
 court determined that the decedent had not done anything other than carry out the normal responsibilities of his job in the days leading up to his heart attack and that, therefore, no triggering event had occurred.  
Kolowski
, 35 F. Supp. 2d at 1063.  Moreover, the court relied on testimony from a doctor that the decedent had suffered from cardiac disease, which the plaintiff failed to rebutt and which would have exempted the decedent's beneficiary from benefitting under the policy.  
Kolowski
, 35 F. Supp. 2d at 1063-64.           

In contrast, Dr. Carney cites to 
Marsh
 for the proposition that "it recognizes that under Illinois law recovery is permitted under a policy if the result is accidental even though the means is intentional."  In 
Marsh
, recovery was sought for the death of a decedent resulting from an overdose of heroin.  
Marsh
, 70 Ill. App. 3d at 790.  The decedent's insurance policy insured against death by "'[a]ccidental means *** independently of all other causes.'"  
Marsh
, 70 Ill. App. 3d at 791.  The 
Marsh
 court found that "[u]nder the Illinois cases recovery is permitted for a death if that result is accidental even though the means of destruction, here the injection of heroin, is intentional.  '"Accidental means" has been held to be synonymous with "accidental result" and defined as something which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual and unforeseen.'"  
Marsh
, 70 Ill. App. 3d at 791-92, quoting 
Taylor v. John Hancock Mutual Life Insurance Co
., 11 Ill. 2d. 227, 230, 142 N.E.2d 5 (1957).  

The 
Marsh
 court compared the conduct of the decedent to conduct that was found to have caused death by "accidental means" in other Illinois cases involving similar insurance policy terms.  
Marsh
, 70 Ill. App. 3d at 792-93.  In 
Taylor
, the decedent and others deliberately spilled 10 gallons of gasoline in a residence, intending to commit arson and collect from a fire insurance policy.  However, the decedent was burned to death when he returned to the house to retrieve some articles and the furnace gas pilot light caused the gasoline to ignite.  In 
Taylor
, the decedent's death was found to have been caused by accidental means.  Similarly, in 
Yates v. Bankers Life & Casualty Co.
, 415 Ill. 16, 111 N.E.2d 516 (1953), the decedent lost his balance and struck his head when he was pushed backwards, out of his home's front door and onto a porch that was lower than the floor of the house.  Our supreme court held that the result was not so foreseeable to render the mishap a nonaccident for insurance purposes.  Finally, in 
Rodgers v. Reserve Life Insurance Co.
, 8 Ill. App. 2d 542, 544-45, 132 N.E.2d 692 (1956), a decedent driver evidenced recklessness when driving 100 miles per hour on a country road at night, with warning of an approaching curve.  However, although decedent driver "clearly failed to exercise judgment, was careless, reckless, perhaps foolhardy, but it does not follow that he intended to destroy himself or imperil the lives of his guest passengers.  His death was not the rational, natural and probable result of his intentional act and, upon the facts as they appear in this record, plaintiff is entitled to recover."  
Rodgers
, 8 Ill. App. 2d at 553-54.  

The 
Marsh
 court reasoned, "It appears that the danger of the insured's death from an unintended overdose was not more foreseeable than the conduct held to be accountable in 
Taylor
, 
Rodgers
 and [
Yates
.]"  
Marsh
, 70 Ill. App. 3d at 793.  The 
Marsh
 court concluded by emphasizing that Illinois courts do not distinguish between accidental means and accidental results; "[t]hus, despite the fact that the means of destruction in the instant case, the act of self-injection, was intentionally caused by the decedent, the mishap must be regarded as an accident since the result of the intentional act, the death, was unintended."  
Marsh
, 70 Ill. App. 3d at 797.     

Thus, in Illinois "accidental" may mean either (1) an injury that is unexpected but may arise from a conscious voluntary act (accidental result) or (2) an injury that is the unexpected result of an unforseen or unexpected act that was involuntary or unintentionally done (accidental means). 
Therefore, Dr. Carney's voluntary acts, which resulted in his development of pronator teres syndrome, do not automatically exclude his receipt of benefits under the "accidental bodily injury" provision of the policy.  Accordingly, we reject the analysis in 
Nehra
 and find 
Kolowski
 distinguishable.

The disability insurance policy in this case defines "injury" to mean "accidental bodily injury," and defines "sickness" to mean "sickness or disease which first manifests itself while this policy is in force."  The evidence in the record, specifically, the unrebutted testimony of Dr. Dwyer, shows that Dr. Carney did not have any disease or sickness associated with pronator teres syndrome.  Rather, the record indicates that Dr. Carney's condition was caused by performing the hand motions required by his profession as a cardiovascular surgeon.  

As stated, the policy here defines "injury" as "accidental bodily injury," which, in the context of this policy and under Illinois law, means a bodily injury that was unexpected but that could have arisen from a conscious or voluntary act.  By using "accidental" to modify the phrase "bodily injuries," the policy places the focus of the coverage on the injury and not the means that caused the injury.  Accordingly, an unexpected physical injury that disables the insured and cannot be identified as a "sickness or disease" is covered as an "injury" under this policy.  As Dr. Dwyer presented unrebutted testimony that Dr. Carney's disability was not the result of either "sickness or disease," under the policy and pursuant to Illinois law, Dr. Carney's injury may be classified as an "accidental bodily injury," specifically, an "accidental result" and a consequence of his chosen profession.    

We also briefly address Paul Revere's argument that Dr. Carney's classification of his disability as a "sickness" for eight years demonstrated that he recognized his disability as such.  Paul Revere points to no provision in the policy that states that once the insured terms his disability a sickness, he is barred from coverage under the injury provisions of the policy.  The fact is the way in which Dr. Carney classified his disability in order to recoup benefits under the policy made no difference until he turned 65, eight years after he began filing claims for benefits.  The benefits Dr. Carney was entitled to receive were the same until he reached age 65 whether classified as "total disability - accident," or "total disability - sickness."  Therefore, we find unpersuasive Paul Revere's arguments that it relied on the claim forms filed by Dr. Carney prior to seeking a reclassification of his disability.   

We find that the circuit court was correct in granting Dr. Carney's motion for summary judgment.  Because the circuit court's decision is supported by the record, we need not address Paul Revere's remaining argument that the circuit court erred in applying workers' compensation law to determine Dr. Carney's disability was an "accidental bodily injury."

CONCLUSION

For the foregoing reasons, the decision of the circuit court is affirmed.

Affirmed.

WOLFSON and HALL, JJ., concur.

FOOTNOTES
1:
The testimony of Dr. Carney and Dr. Dwyer stated that pronator teres syndrome was similar to carpal tunnel syndrome. 

2: "Duodenum" is defined as "the first part of the small intestine, extending from the pylorus to the jejunum."  Webster's Ninth New Collegiate Dictionary 389 (1990).